## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNIVERSITY OF COLORADO HEALTH | : | | |
| AT MEMORIAL HOSPITAL, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 14-1220 (RC) |
| | : | | |
| v. | : | Re Document No.: | 53 |
| | : | | |
| SYLVIA M. BURWELL, Secretary, | : | | |
| United States Department of | : | | |
| Health and Human Services, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR CLARIFICATION, CONSTRUED AS A MOTION FOR RECONSIDERATION

## I. INTRODUCTION

Plaintiffs, a group of thirty-five acute care hospitals, have challenged several regulations promulgated by the Department of Health and Human Services ("HHS") implementing the Outlier Payment System. Plaintiffs previously moved to compel HHS to produce a variety of materials that, Plaintiffs claimed, were properly part of the administrative record. In a November 9, 2015 Memorandum Opinion the Court granted in part and denied in part that motion. *See generally* Mem. Op., ECF No. 47; *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, --- F. Supp. 3d ----, 2015 WL 6911261 (D.D.C. Nov. 9, 2015). Specifically, the Court concluded that Plaintiffs had identified reasonable, non-speculative grounds to believe that five categories of materials had been considered by HHS but were not included in the administrative record. *See* Mem. Op. at 17–38. Accordingly, the Court ordered HHS to supplement the administrative record with those materials. *See* Nov. 9, 2015 Order, ECF No. 46.

HHS has now moved for clarification of the Court's order.  HHS contends that, with respect to two of the items the Court ordered produced, "the Secretary does not possess materials that are responsive to those items that have not already been included in the administrative records." Def.'s Mot. for Clarification at 2 ("Def.'s Mot."), ECF No. 53.  The agency has filed a more detailed Declaration from the Centers for Medicare & Medicaid Services' ("CMS") Director of the Division of Acute Care, Hospital and Ambulatory Policy Group explaining where those items can be found in the administrative rulemaking records.  *See* Def.'s Mot. Ex. A ("Second Cheng Decl.").  Upon consideration of the motion—which the Court will construe as a motion for reconsideration—and Plaintiffs' opposition thereto, the Court will grant the motion.[1]

## II.  FACTUAL BACKGROUND

This Court has already explained the factual and regulatory background in detail, and assumes familiarity with the Court's prior Memorandum Opinion.  *See* Mem. Op. at 2–11.

Briefly stated, the Inpatient Prospective Payment System ("IPPS") reimburses hospitals under

---

[1] HHS also moves for clarification on the ground that it has been unable to locate the cost report data for the FY 2007 rulemaking that the Court ordered added to the administrative record. As Ms. Cheng asserts, "[g]iven the large size of HCRIS [the Hospital Cost Report Information System] files, [and] due to storage limitations on the mainframe, CMS overwrites the data on the mainframe with each subsequent update of the HCRIS data" and CMS "cannot feasibly retain all working files or intermediate data produced in the course of its rulemaking processes."  Second Cheng Decl. ¶ 24.  After undertaking "a diligent search for the cost report data," HHS reports that it "was unable to produce data files for FY 2007 that are assured to match the cost report data used to calculate the annual percentage increases of operating costs per discharge for the FY 2007 fixed loss threshold." *Id.* ¶ 25.  The agency was able to locate, and has supplemented the administrative record with, the cost report data for FYs 2008, 2011, and 2012. *Id.* ¶ 23; *see also* Certification of the Rulemaking Record at 3, ECF No. 52.  While the Court finds the agency's failure to retain that data unfortunate, Plaintiffs acknowledge, but do not contest, HHS's request for clarification on this ground. *See* Pls.' Opp'n at 4 n.2 (noting that "HHS's present motion admits its failure to retain certain cost report data that it was ordered to produce").  Because Plaintiffs do not challenge HHS's failure to retain the data, the Court grants the request, construed as a motion for reconsideration, as conceded.  The parties can address the significance of this failure, if any, in their briefing on the merits.

Medicare based on a "standardized amount," which represents the average operating cost for inpatient hospital services, regardless of the particular costs a hospital incurs in treating an individual patient. *See Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011). But, recognizing that "health-care providers would inevitably care for some patients whose hospitalization would be extraordinarily costly or lengthy," Congress created the Outlier Payment Program. *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1009 (D.C. Cir. 1999). The program permits a hospital to recoup an additional payment, called an "outlier payment," if the costs incurred during the care of a particular patient exceed a certain fixed dollar amount. *Id.* The fixed dollar amount—referred to as the "fixed loss threshold"—"serves as the cutoff point triggering eligibility for outlier payments." *Banner Health v. Sebelius*, 945 F. Supp. 2d 1, 8 (D.D.C. 2013).

HHS sets the fixed loss threshold annually, by regulation, to govern hospitals' eligibility for outlier payments during the upcoming fiscal year. Congress has provided that the aggregate amount of outlier payments in any one fiscal year "may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made" under the IPPS program for that year. 42 U.S.C. § 1395ww(d)(5)(A)(iv). To ensure that its selected fixed loss threshold meets this statutory mandate, HHS "simulate[s] payments" that will be made under the IPPS program during the upcoming fiscal year using data of the charges hospitals incurred in actual cases two years previously, after omitting inaccurate data and adjusting those charges for inflation. *See, e.g.*, Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates, 72 Fed. Reg. 47,130, 47,419 (Aug. 22, 2007) [hereinafter "FY 2008 Final Rule"]. The agency also projects a hospital-specific "cost-to-charge ratio" or "CCR," which represents the average differential between the charges that a particular hospital

lists on a patient's invoice and the actual costs that particular hospital incurs in treating a patient. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 49–50 (D.C. Cir. 2015).  To simulate charges for the upcoming fiscal year, HHS also adjusts those CCRs for anticipated inflation, applying what is called a "CCR adjustment factor."  *See, e.g.*, FY 2008 Final Rule, 72 Fed. Reg. at 47,418.  Using the inflated charges and CCRs, HHS simulates payments to determine the fixed loss threshold at which, it anticipates, outlier payments will equal "5.1 percent of total IPPS payments" during the fiscal year.  *See, e.g.*, *id.* at 47,419.  During each of its annual rulemakings, HHS also uses more recent data to update its estimate of the outlier payments it has made during the prior two fiscal years.  *See, e.g.*, *id.* at 47,420.

In their motion to compel, Plaintiffs sought, among other things, the formulas HHS used each fiscal year to calculate the fixed loss threshold and to update the agency's estimates of the outlier payments made during the prior two fiscal years.  *See* Mem. Op. at 23, 26.  As this Court previously explained, HHS's rulemaking notices' "general descriptions make clear how HHS arrives at the two crucial variables necessary to its calculation of anticipated IPPS payments: the agency uses MedPAR files from two years prior, as inflated, to approximate the charges that providers will incur and the agency then uses adjusted CCRs to convert those charges to anticipated costs."  *Id.* at 24.  But the Court noted that "[w]hat is not fully explained" in the rulemaking notices "is the mechanism by which HHS uses those two variables to simulate payments and produce a particular fixed loss threshold."  *Id.*  The Court explained that "the payment calculation mechanism's absence from the administrative record—or any detail about it—presents a patent obstacle to effective judicial review."  *Id.* at 24–25.  Accordingly, the Court ordered HHS "to supplement the record with the formula or algorithm through which the agency simulates payments."  *Id.* at 25.  And the Court further noted that, because the rulemakings also

reference "simulations" that HHS used to compute the estimated outlier payments for previous fiscal years, "the Court assumes that these calculations are similar, if not identical, to those used to simulate payments prospectively when setting the fixed loss threshold." *Id.* at 27. Thus, the Court similarly ordered HHS to supplement the administrative record with "the formulas used to calculate estimated outlier payments for prior fiscal years." *Id.*

The Court did suggest, however, that "more specificity" might be "provided in the 2003 Payment Regulations." *Id.* at 26. Those regulations substantially modified the HHS outlier payment methodology and do "describe an elaborate formula that 'simulates the IPPS outlier payment for a case at a generic hospital.'" *Id.* (quoting Medicare Program; Change in Methodology for Determining Payment for Extraordinarily High-Cost Cases (Cost Outliers) Under the Acute Care Hospital Inpatient and Long-Term Care Hospital Prospective Payment Systems, 68 Fed. Reg. 34,494, 34,495 (June 9, 2003) [hereinafter "2003 Payment Regulations"]). The Court explained, however, that HHS's briefing "d[id] not mention the 2003 regulation in connection with the alleged formulas that Plaintiffs seek." *Id.* In addition, although the Court surmised that "it is perhaps conceivable that HHS employs this hospital-specific mechanism on a macro level to simulate anticipated payments across all providers (using the inflated charges and adjusted CCRs)," the Court concluded that "the agency's description in the Federal Register does not make any connection immediately clear." *Id.*

HHS has now moved for clarification. The agency argues that the "the administrative rulemaking records that have already been produced contian [sic] all of the formulas that CMS used to calculate the fixed loss thresholds at issue as well as all of the formulas used to calculate estimated outlier payments for prior fiscal years during the rulemakings at issue." Def.'s Mot. at 2. Therefore, HHS seeks clarification that "the Secretary is not obligated to supplement the

administrative records by creating materials or otherwise producing materials that are not already in existence." *Id.* at 1.

## III. ANALYSIS

While HHS styles its motion as one for clarification, the Court construes it as a motion for reconsideration. "[T]here is no Federal Rule of Civil Procedure specifically governing 'motions for clarification.'" *United States v. Philip Morris USA, Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011). "The general purpose of a motion for clarification is to explain or clarify something ambiguous or vague, not to alter or amend." *Id.* (quoting *Resolution Trust Corp. v. KPMG Peat Marwick, et al.*, No. 92-1373, 1993 WL 211555, at *2 (E.D. Pa. June 8, 1993)). In this case, HHS's motion does not ask the Court to further explain or clarify its November 9, 2015 order. Nor does HHS's motion identify any "ambiguous" or "vague" portions of that order. *Cf. id.* at 168 (noting that the defendants' motion there did not identify portions of the order that were vague or ambiguous, and instead asked the court for "relief from a judgment or order under Rule 60(b)").

Instead, HHS's motion seeks to revisit the Court's determination that the formulas the agency used to calculate the fixed loss threshold and to estimate prior outlier payments were absent from the administrative record, and its conclusion that Plaintiffs had therefore met their burden to "identify reasonable, non-speculative grounds for [their] belief that the documents were *considered* by the agency and not included in the record." *Marcum v. Salazar*, 751 F. Supp. 2d 74, 75 (D.D.C. 2010) (emphasis in original) (internal quotation mark omitted) (quoting *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006)). HHS essentially asks this Court to alter its factual conclusion that the rulemaking notices do not fully detail the necessary formulas and that, therefore, other materials

must exist which are properly part of the administrative record.  HHS thus urges the Court to

reverse its determination that the administrative record must be supplemented.  Properly viewed,

its motion is one for reconsideration under Rule 54(b), and the Court will construe it as such.[2]

A district court has "broad discretion to hear a motion for reconsideration brought under

Rule 54(b)."  *Isse v. Am. Univ.*, 544 F. Supp. 2d 25, 29 (D.D.C. 2008).  While different

jurisdictions "'apply a variety of different standards when confronted with a motion for

reconsideration,' this jurisdiction has established that reconsideration is appropriate 'as justice

requires.'"  *Lyles v. District of Columbia*, 65 F. Supp. 3d 181, 188 (D.D.C. 2014) (citation

omitted) (quoting *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005)).  "[A]sking 'what

justice requires' amounts to determining, within the Court's discretion, whether reconsideration

is necessary under the relevant circumstances."  *Cobell*, 355 F. Supp. 2d at 539.  "Considerations

a court may take into account under the 'as justice requires' standard include whether the court

'patently' misunderstood the parties, made a decision beyond the adversarial issues presented,

made an error in failing to consider controlling decisions or data, or whether a controlling or

significant change in the law has occurred."  *Isse*, 544 F. Supp. 2d at 29.  In general, "a court will

grant a motion for reconsideration of an interlocutory order only when the movant demonstrates:

---

[2] Although Plaintiffs urge that the motion should be considered under Rule 60(b), that
Rule "applies only to *final judgments or orders*, while Rule 54(b) applies to *interlocutory orders*
that adjudicate fewer than all the claims in a given case."  *Lewis v. United States*, 290 F. Supp.
2d 1, 3 (D.D.C. 2003) (emphasis added); *compare* Fed. R. Civ. P. 60(b) (providing relief from "a
final judgment, order, or proceeding"), *with* Fed. R. Civ. P. 54(b) ("[A]ny order or other
decision, however designated, that adjudicates fewer than all the claims . . . does not end the
action as to any of the claims or parties and may be revised at any time before the entry of a
judgment adjudicating all the claims and all the parties' rights and liabilities.").  "This distinction
is important because, although courts only reconsider under Rule 60(b)(6) in 'exceptional
circumstances,' courts have more flexibility in applying Rule 54(b)."  *Moore v. Hartman*, 332 F.
Supp. 2d 252, 256 (D.D.C. 2004).  Here, the Court's order on Plaintiffs' motion to compel
necessarily preceded any consideration of the merits, and therefore is interlocutory.

(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order." *Stewart v. Panetta*, 826 F. Supp. 2d 176, 177 (D.D.C. 2001) (quoting *Zeigler v. Potter*, 555 F. Supp. 2d 126, 129 (D.D.C. 2008)).

*Cobell* also suggests that, because "the decision whether to reconsider its interlocutory rulings is within the Court's discretion," the Court "may nevertheless elect to grant a motion for reconsideration if there are other good reasons for doing so," even "if the appropriate legal standard does not indicate that reconsideration is warranted." 355 F. Supp. 2d at 540; *accord Isse*, 544 F. Supp. 2d at 29. The district court's discretion is limited, however, "by the law of the case doctrine and 'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quoting *In re Ski Train Fire in Kaprun, Austria, on November 11, 2004*, 224 F.R.D. 543, 546 (S.D.N.Y. 2004)).

In addition to showing a clear error, a change in the law, the discovery of new evidence, or another good reason to grant the motion, the party seeking reconsideration must also show that "some harm would accompany a denial of the motion to reconsider." *Isse*, 544 F. Supp. 2d at 29. For "justice to require reconsideration, logically, it must be the case that some sort of 'injustice' will result if reconsideration is refused." *Cobell*, 355 F. Supp. 2d at 540.

Here, HHS supports its motion with a second declaration from CMS's Director of the Division of Acute Care, Hospital and Ambulatory Policy Group, Ms. Ing-Jye Cheng. *See generally* Second Cheng Decl. That declaration sets forth considerable additional detail regarding the formulas that HHS employs when setting the fixed loss threshold. Ms. Cheng's declaration explains that, generally, HHS "simulates outlier payments for IPPS hospitals identified in the Impact Files produced among the rulemaking records in this case under different

thresholds in the coming fiscal year and selects the threshold at which outlier payments meet the 5.1 percent target for the coming fiscal year." *Id.* ¶ 7.  To simulate those payments for each IPPS hospital, CMS "employ[s] the outlier payment methodology that is set forth in the outlier payment regulations, as amended in 2003," and "as modified by applying an adjustment factor to the cost-charge ratios." *Id.* ¶ 8; *see also* 2003 Payment Regulations, 68 Fed. Reg. at 34,495. Although the methodology detailed in the 2003 Payment Regulations "describes how a single outlier payment is calculated," Ms. Cheng explains that, "[t]o arrive at total outlier payments, all the individual outlier payments calculated using that formula are added together."  Second Cheng Decl. ¶ 9.

Ms. Cheng's declaration then provides a more "detailed description" of how that mechanism is used to calculate the fixed loss threshold.  *Id.* ¶¶ 11–17.  She walks through the formulas provided in the 2003 Payment Regulation, explaining the various inputs relevant at each step of the analysis, and where to find those inputs in the administrative record and rulemaking notices.  *See, e.g.*, *id.* ¶ 12 (noting that the "DRG Relative Weights, applicable standardized amounts, and wage index are specified in the IPPS final rule and/or posted on the CMS website each year," and that the "hospital-specific" Indirect Medical Education (IME) and Disproportionate Share Hospital (DSH) inputs are "located in the Impact Files that HHS produced among the administrative rulemaking records"); *see also* 2003 Payment Regulations, 68 Fed. Reg. at 34,495.

As Ms. Cheng explains, CMS first calculates federal operating and capital payments that would be made on a particular claim under the new FY policies.  Second Cheng Decl. ¶ 12. CMS next projects the operating and capital costs a hospital will incur on that claim in the upcoming fiscal year by inflating the hospitals' charges from the relevant MedPAR file.  *Id.* ¶ 13.

CMS then selects a "projected fixed loss threshold" and plugs that threshold into the formula along with various geographic and hospital-specific adjustments as identified in the rulemaking notices. *Id.* ¶¶ 9, 14. Based on that fixed loss threshold, CMS "computes the outlier payment for each claim." *Id.* ¶ 15. To determine whether the projected fixed loss threshold complies with the statutory mandate that *total* outlier payments constitute no more than 6% of total IPPS payments but not less than 5%, the agency then calculates the percentage of outlier payments among all projected IPPS payments by "dividing the total operating outlier payments by the total operating DRG payments plus total operating outlier payments." *Id.* ¶ 16. If the resulting percentage does not meet CMS's chosen target of 5.1%, then "CMS repeats this process with a different projected fixed loss threshold." *Id.*

In terms of the second formula this Court ordered HHS to produce—the formula used to calculate estimated outlier payments for prior fiscal years—Ms. Cheng's Declaration also explains that "the formulas that CMS applies to estimate whether CMS met its 5.1 percent target in prior years are the same formulas that CMS uses to project the FLT in the annual IPPS final rule for the upcoming fiscal year." *Id.* ¶ 22. Those formulas only differ in the data that is used; to estimate *past* payments CMS necessarily uses prior years' rates and policies. *Id.* ("CMS necessarily uses different data inputs to estimate the prior payments than it uses to set the upcoming FLT.").

With HHS's more robust explanation in hand, the Court believes that there now exist "good reasons" for granting HHS's motion, *Cobell*, 355 F. Supp. 2d at 540. As the Court explained in its Memorandum Opinion, the briefing to that point had "fail[ed] to sufficiently explain how the existing administrative record sets forth all of the formulas necessary to fully delineate the agency's path." Mem. Op. at 26. The Court did suggest that it was "perhaps

conceivable" that CMS employed "the hospital-specific mechanism" contained in the 2003

Payment Regulations "on a macro level to simulate anticipated payments across all providers

(using the inflated charges and adjusted CCRs)."  *Id.*  HHS has now confirmed that possibility,

with Ms. Cheng explaining that, although "[t]he formula describes how a single outlier payment

is calculated," to "arrive at total outlier payments, all the individual outlier payments calculated

using that formula are added together."  Second Cheng Decl. ¶ 9.  In the Court's view, the

agency would be well-served by providing greater detail in the fiscal year rulemaking notices

beyond its somewhat vague allusion to "simulations," and thereby more directly notifying

regulated entities, the public, and the courts of this connection.  Despite that concern, however,

for purposes of Plaintiffs' motion to compel HHS's belated explanation now clarifies that, with

respect to the formulas, HHS did not fail to include in the administrative record all "materials

that were part of its record, whether by design or accident."  *Marcum*, 751 F. Supp. 2d at 78.

Accordingly, the Court is satisfied that the administrative record, as supplemented since the

Court issued its November 9, 2015 Order, now contains all of the information the agency

considered "directly or indirectly."  *Id.*

      Plaintiffs resist this conclusion on several fronts.  First, Plaintiffs repeatedly assert that

the *real* formulas HHS employed remain absent from the record and that HHS is simply

"repeat[ing] its position, previously rejected, that the Federal Register is an adequate substitute

for the formula(s) that HHS used."  Pls.' Opp'n to Def.'s Mot. for Clarification at 4 ("Pls.'

Opp'n").  Yet, Plaintiffs misconstrue the Court's prior Memorandum Opinion.  The Court did

not conclude that any formulas already described in the Federal Register did not match the actual

formulas that HHS employed (nor did HHS claim that it was relying on different formulas, as

contained in the rulemaking records, in lieu of the actual formulas it employed).  Instead, the

Court merely expressed concern that the rulemaking notices failed *altogether* to clarify what formula the agency applied.  Having now put that concern to rest, the record contains no support for Plaintiffs' assertion that HHS possesses some other "actual formulas that it used" but "is refusing to produce."  Pls.' Opp'n at 6.[3]

Plaintiffs also argue that HHS's attempt to clarify the administrative record with Ms. Cheng's declaration constitutes an improper *post hoc* rationalization.  *See id.* at 5.  The Court disagrees.  The "'*post hoc* rationalization'" rule "forbids judges [from] uphold[ing] agency action on the basis of rationales offered by anyone *other than the proper decisionmakers*." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (emphasis added) (quoting *Local 814, Int'l Bhd. of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976)); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (noting that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action").  Particularly in the circumstances of a remand to an agency for further explanation, however, the rule does not forbid *an agency*, itself, from "provid[ing] an explanation for an inadequately articulated decision."  *Alpharma*, 460 F.3d at 6; *see also Local 814*, 546 F.2d at 992 ("The policy of the *post hoc* rationalization rule does not prohibit [the agency] from submitting an amplified articulation of the distinctions it sees . . . .").  As the D.C. Circuit has explained, "there is nothing improper in receiving declarations that merely illuminate[] reasons obscured but implicit in the administrative record."  *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (alteration in

---

[3] For similar reasons, Plaintiffs' claims that "HHS does <u>not</u> deny that it possesses the formula(s) in question or even claim that the formula(s) do not exist" or "that the actual formula(s) that the agency in fact used during the rulemakings are available for the Court's review" are unfounded.  Pls.' Opp'n at 3–4, 5 (emphasis in original).  As HHS's explanation makes plain, the formulas set forth in the 2003 Payment Regulations and the formulas used to set the fixed loss threshold and to estimate prior years' outlier payments are one in the same.

original) (internal quotation marks and citation omitted).  In the Court's view, by further

explaining an assumption even this Court considered "conceivable" on the basis of the

rulemaking notices, *see* Mem. Op. at 26, the agency has simply illuminated a connection

between the fiscal year rulemakings and the 2003 Payment Regulations which the administrative

record left somewhat implicit.

Finally, Plaintiffs also point to two alleged omissions from Ms. Chen's explanation in an

effort to undermine it.  Neither is persuasive.  First, Plaintiffs assert that the formulas described

in Ms. Cheng's declaration (and the 2003 Payment Regulation) cannot possibly constitute the

relevant formulas because they fail to discuss variations in the "Applicable Standardized

Amount."  *See* Pls.' Opp'n at 6.  Some background is necessary to understand this contention.

As explained above, IPPS payments are based on a "standardized amount" which represents the

average operating cost for inpatient hospital services.  *See Cape Cod Hosp.*, 630 F.3d at 205.

Congress has required that, each year, the standardized amount be set by reference to "the

respective average standardized amount computed for the previous fiscal year" and then

increased for the next fiscal year "by the applicable percentage increase."  42 U.S.C. §

1395ww(d)(3)(A)(i).  By statute, the "applicable percentage increase" for each fiscal year

relevant in this case must match "the market basket percentage increase for hospitals in all

areas," *see id.* § 1395ww(b)(3)(B)(i)(XX), with additional statutorily-mandated percentage point

reductions or adjustments for increases in economic productivity, *see id.* § 1395ww(b)(3)(B)(xi)

(describing productivity adjustments); *id.* § 1395ww(b)(3)(B)(xii) (setting, as relevant here, an

additional 0.25 percentage point reduction for fiscal years 2010 and 2011, and a 0.1 percentage

point reduction for fiscal years 2012 and 2013).

Whether a hospital complies with separate requirements regarding quality care data also affects the "applicable percentage increase" it receives.  Beginning in 2005, Congress required hospitals to submit annually to HHS data depicting various measures of the quality of care a hospital provides to its patients.  *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173 § 501(b), 117 Stat. 2066, 2289–90.  Congress initially provided that between 2005 and 2007 the "applicable standard increase" for a hospital's IPPS payments would be reduced by 0.4 percentage points if that hospital failed to provide this data.  *See id.*  Congress has since amended the section to provide that for 2007 and beyond—and thus for each fiscal year Plaintiffs challenge in this case—a hospital faces a reduction of 2.0 percentage points if it fails to submit that data.  *See* 42 U.S.C. § 1395ww(b)(3)(B)(vii)(I).  As a result, certain hospitals receive a "reduced update" to the national standardized amount, and thus reduced IPPS payments and outlier payments.  *See, e.g.*, Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and FY 2012 Rates, 76 Fed. Reg. 51,476, 51,796–97 (Aug. 18, 2011) [hereinafter "FY 2012 Final Rule"] (providing chart detailing the "full update" and "reduced update" applicable to hospitals with a wage index of less than 1, and the "full" and "reduced" update for hospitals with a wage index of greater than 1).

On the basis of this potential reduction, Plaintiffs maintain that Ms. Cheng's declaration "still leaves gaps in the explanation of HHS's 'simulations'" because it "omits any discussion" of which hospitals receive the full or reduced "applicable standardized amount." Pls.' Opp'n at 6. HHS responds that the final fiscal year rulemaking notices list the number of hospitals that failed to submit quality care data in the prior fiscal year, and that HHS bases its simulations on the number of hospitals that received the reduced payment update in the previous year.  Def.'s Reply

at 5.  Indeed, each page of the Federal Register that Plaintiffs cite for the proposition that the administrative record "fails to explain how HHS assigned these 'full' versus 'reduced' updates when setting the fixed loss thresholds," Pls.' Opp'n at 6, in fact *explicitly identifies* the number of hospitals that failed to submit quality of care data in the prior fiscal year and notes that "[f]or purposes of the simulations," the agency "modeled the payment changes" for the upcoming fiscal year using a reduced update for those specific hospitals, *see, e.g.*, Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2007 Rates, 71 Fed. Reg. 47,870, 48,333 (Aug. 18, 2006) [hereinafter "FY 2007 Final Rule"] ("At the time this impact was prepared, 117 providers did not receive the full market basket rate-of-increate [sic] for FY 2006 because they failed the quality data submission process. For purposes of the simulations shown below, we modeled the payment changes for FY 2007 using a reduced update for these 117 hospitals.").[4]

Despite Plaintiffs' puzzling citation to material that in fact does disclose the number of hospitals that HHS assumed for purposes of its simulations would fail to provide quality of care data, the Court does note that those references appear confined to each fiscal year rulemaking's "Regulatory Impact Analysis."  Although those sections reference "simulations," it is not immediately clear to the Court that those simulations are identical to the simulations that the agency conducts to model prospective IPPS payments for the upcoming fiscal year.

---

[4] *See also* FY 2008 Final Rule, 72 Fed. Reg. 47,130, 48,159 (Aug. 22, 2007) (same for "146 hospitals"); Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System Changes and FY 2011 Rates, 75 Fed. Reg. 50,042, 50,649 (Aug. 16, 2010) [hereinafter "FY 2011 Final Rule"] (same for "104 hospitals"); FY 2012 Final Rule, 76 Fed. Reg. 51,476, 51,816 (Aug. 18, 2011) (same for "57 hospitals").

In any event, the formula contained in the 2003 Payment Regulations already conceives of the use of different "applicable standardized amounts" based on certain adjustments for wage levels and geographic considerations. *See* 2003 Payment Regulations, 68 Fed. Reg. at 34,495. As Ms. Cheng's declaration further explains, and as the annual rulemaking notices show, the "applicable standardized amounts"—identified by whether they constitute the "full" or "reduced" update—are listed for each applicable standardized amount. *See* Second Cheng Decl. ¶ 12; *see also, e.g.*, FY 2008 Final Rule, 72 Fed. Reg. at 47,435; FY 2012 Final Rule, 76 Fed. Reg. at 51,813. Thus, given Ms. Cheng's explanation that HHS aggregates the payments made on each claim when it simulates payments, and the rulemaking notices' explanation that simulations are run by applying the upcoming year's "rates and policies" to prior year's claims, *see, e.g.*, FY 2012 Final Rule, 76 Fed. Reg. at 51,792, the Court assumes that these amounts are taken into account, in some fashion, in setting the upcoming year's threshold level. Nor does the Court ultimately believe that any remaining discrepancy casts doubt on HHS's explanation that the requisite formulas are contained in the 2003 Payment Regulations. The agency is plainly aware of the quality of care provision, and forecasts hospitals' compliance with it in some fashion based on prior years' results. Whether the agency's resulting calculations sufficiently take into account the possibility that certain hospitals will receive a reduced update is best left for the Court's arbitrary and capricious review on the merits.[5]

---

[5] HHS also represents that "the number of hospitals that fail to report quality data, and thus receive a reduced payment update, is exceedingly small"—numbering less than 150 for every year at issue here—such that "the impact of application of reduced payment updates in HHS's simulations has a miniscule impact on determination of the fixed loss threshold." Def.'s Reply at 5. To the extent this argument is intended to imply that HHS need not take this issue into consideration *at all* when it simulates prospective payments, the Court similarly defers that argument for its review on the merits.

The second alleged omission Plaintiffs raise relates only to HHS's estimation of the outlier payments made in prior fiscal years.  In response to comments urging the agency to use actual historical payment data, and not "modeled data," to compute the actual percentage of outlier payments made in prior fiscal years, the 2011 and 2012 rulemaking notices justify the agency's use of modeling by explaining that it "model[s] which SCHs [Sole Community Hospitals] would have greater hospital-specific payment amounts versus their Federal payments . . . and exclude[s] those providers from [its] determination of FY 2010 actual outlier payments." FY 2012 Final Rule, 76 Fed. Reg. at 51,796; *see also* FY 2011 Final Rule, 75 Fed. Reg. at 50,431 (justifying reliance on modeling because "various payment exceptions under the IPPS such as the hospital specific rate payment adjustment for Sole Community Hospitals and Medicare Dependant Hospitals complicate the use of the payment field shown on the MedPAR file").  Regulations require that Sole Community Hospitals (hospitals that are "located more than 35 miles from other like hospitals" or "in a rural area," and meet additional requirements) receive reimbursements based on which rate, among various repayment rates, "yields the greatest aggregate payment for the cost reporting period."  42 C.F.R. § 412.92.

Plaintiffs urge that the "administrative record lacks any formula explaining, or at least demonstrating, the basis upon which such data (that HHS asserts was excluded) was actually excluded."  Pls.' Opp'n at 8.  As HHS points out, though, the passage Plaintiffs highlight "does not purport to describe HHS's *formula* for modeling payments," but instead explains *why* HHS chooses to model payments.  Def.'s Reply at 8 (emphasis added).  Perhaps the agency has not sufficiently identified which SCH claims it excluded from the dataset when estimating the prior years' outlier payments—a question that may be examined on the merits when the Court considers whether the fiscal year regulations are arbitrary and capricious.  But HHS's

acknowledgement that it excludes the payments made to certain SCH providers when it models

payments does not cast doubt on Ms. Cheng's explanation of how the fixed loss threshold is

calculated once the universe of claims, omitting those payments, has been identified.  And while

Plaintiffs claim that this acknowledgement undercuts HHS's assertion that it uses the same

formula to calculate prospective and past outlier payments, Pls.' Opp'n at 8, the Court does not

understand that to be so.  HHS may well make certain calculations to project *whether* a particular

SCH will have a greater hospital specific payment amount or federal payment amount.  Cut once

HHS has determined which SCHs will receive payments under the IPPS program, the Court

presumes—or at least there is nothing in the record to indicate otherwise—that those IPPS

program payments are modeled and aggregated using the same formula identified in the 2003

Payment Regulations.

Having concluded that the Court should reconsider its prior ruling that the administrative

record did not contain the formulas used to set the fixed loss threshold and project prior years'

outlier payments, HHS must also show that "some harm will accompany a denial of the motion

to reconsider," *Stewart*, 826 F. Supp. 2d at 177 (quoting *Zeigler*, 555 F. Supp. 2d at 129), or that

"some sort of 'injustice' will result if reconsideration is refused," *Cobell*, 355 F. Supp. 2d at 540.

The Court acknowledges that its discretion to reconsider an interlocutory ruling is "subject to the

caveat that where litigants have once battled for the court's decision, they should neither be

required, nor without good reason permitted, to battle for it again," *Singh*, 383 F. Supp. 2d at 101

(quoting *In re Ski Train Fire*, 224 F.R.D. at 546), and that "it is well-established" that a motion

for reconsideration "cannot be used . . . 'as a vehicle for presenting theories or arguments that

could have been advanced earlier,'" *Estate of Gaither ex rel. Gaither v. District of Columbia*,

771 F. Supp. 2d 5, 10 (quoting *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010)).  In this

circumstance, where the Court explicitly noted in its Memorandum Opinion that its decision had much to do with HHS's failure to fully explain how the administrative record already set forth the formulas the agency used to simulate outlier payments, these reminders carry considerable force. At the same time, however, now that HHS has clarified how the administrative record does contain all materials that the agency considered directly or indirectly, harm or injustice would necessarily follow if the Court denied HHS's motion. A reviewing court "should have before it neither more nor less information than did the agency when it made its decision." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997). Reviewing "less than the full administrative record," might "allow a party to withhold evidence unfavorable to its case," while reviewing "more than the information before the agency at the time of its decision," risks "requiring administrators to be prescient or allowing them to take advantage of post hoc rationalizations." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). To require CMS or HHS to create new materials at this stage would contravene the cardinal principle that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Accordingly, the Court will review the 2003 Payment Regulations and fiscal year threshold regulations based on the administrative record now before it.

## IV.  CONCLUSION

For the foregoing reasons, HHS's motion for clarification, construed as a motion for reconsideration, is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 19, 2016                                          RUDOLPH CONTRERAS
                                                                              United States District Judge