**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNIVERSITY OF COLORADO HEALTH AT MEMORIAL HOSPITAL, f/k/a MEMORIAL HOSPITAL OF COLORADO SPRINGS, *et al.*,

Plaintiffs

v.

ALEX M. AZAR II, Secretary of Health and Human Services,

Defendant

Consolidated Cases:

CHARLESTON AREA MEDICAL CENTER, *et al.*, v. AZAR;

RIVERVIEW MEDICAL CENTER, *et al.*, v. AZAR;

WEST VIRGINIA UNIVERSITY HOSPITAL, *et al.*, v. AZAR;

GRADY MEMORIAL HOSPITAL, *et al.*, v. AZAR;

BAYSHORE COMMUNITY HOSPITAL, *et al.*, v. AZAR;

CABELL-HUNTINGTON HOSPITAL, *et al.* v. AZAR; and

SARASOTA MEMORIAL HOSPITAL, *et al.*, v. AZAR

No. 14-cv-1220 (RC)

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. A Hospital Challenges Its Annual Reimbursement Through a Statutory Review Procedure ..... 2

B. The Hospitals Have Challenged Their Annual Reimbursements In a Series of Cases ..... 4

C. The Hospitals' Annual Reimbursements Were Too Low Because of Defects in HHS's Threshold-Setting Rules ..... 7

III. SUMMARY OF THE ARGUMENT ..... 7

IV. LEGAL STANDARD ..... 9

V. ARGUMENT ..... 9

A. The Court Has Jurisdiction to Consider All the Disputes Raised in These Cases ..... 9

B. There are No "Abandoned Claims" Subject to Dismissal ..... 12

C. The Amended Complaints Present No Claims or Issues that Are Precluded ..... 13

1. The claims presented in *Banner* and *Billings* were claims to full and proper payment on cost reports ..... 15

2. Neither *Banner* nor *Billings* decided an "issue" as expansive as the overall validity of HHS's rules; and HHS has not identified any issue being litigated that may be precluded ..... 22

3. Preclusion does not bar a hospital from presenting claims and issues that were decided against other participants in *Banner* or *Billings* ..... 27

4. HHS fails to establish the factual predicates for the narrow "assumed control" form of non-party preclusion ..... 32

D. HHS Failed to Comply With the Medicare Act's Notice-and-Comment Requirements Before Applying Its Pivotal Cost-to-Charge Ratio Adjustment Factor ..... 35

1. Notice-and-comment on a proposed threshold means notice and comment on the methods and facts supporting the choice of threshold ..... 35

2. HHS's policy about how to forecast cost-to-charge ratios was itself a substantive legal standard ..... 39

**TABLE OF CONTENTS**
(continued)

**Page**

3. HHS ordinarily treats changes in its threshold-setting methodologies as being subject to notice and comment requirements ..... 40

E. HHS Has Identified No Prior Inconsistent Position That Could Warrant Judicial Estoppel ..... 41

F. HHS Cannot Contest the Addition of Certain Claims by Amendment ..... 42

VI. CONCLUSION ..... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam v. Saenger*,
303 U.S. 59 (1938) .....29

*Adams v. Morton*,
581 F.2d 1314 (9th Cir. 1978) .....29, 30

*Air Transportation Association of America v. FAA*,
169 F.3d 1 (D.C. Cir. 1997) .....36

**Allina Health Servs. v. Price*,
863 F.3d 937 (D.C. Cir. 2017) .....12, 39, 40

*Am. Med. Int'l, Inc. v. Sec'y of Health, Educ. & Welfare*,
677 F.2d 118 (1981) .....16

*American Radio Relay League, Inc. v. FCC*,
524 F.3d 227 (D.C. Cir. 2008) .....36, 37

*Aves. in Leather, Inc. v. United States*,
317 F.3d 1399 (Fed. Cir. 2003) .....17

*Azar v. Allina Health Servs.*,
139 S. Ct. 1804 (2019) .....39

*B&B Hardware, Inc. v. Hargis Indus.*,
135 S. Ct. 1293 (2015) .....22

*Banner Health v. Burwell*,
126 F. Supp. 3d 28 (D.D.C. 2015) .....10, 11

*Banner Health v. Price*,
867 F.3d 1323 (D.C. Cir. 2017) ..... *passim*

*Bayshore Cmty. Hosp. v. Azar*,
No. 16-2353 (D.D.C.) .....31

*BEG Invs., LLC v. Alberti*,
85 F. Supp. 3d 13, 26 (D.D.C. 2015) .....44

*Billings Clinic v. Azar*,
901 F.3d 301 (D.C. Cir. 2018) ..... *passim*

*Burlington N. Santa Fe R.R. v. Assiniboine & Sioux Tribe*,
323 F.3d 767 (9th Cir. 2003) ....................16

*Canonsburg Gen. Hosp. v. Burwell*,
989 F. Supp. 2d 8 (D.D.C. 2013) ....................26

*Canonsburg General Hospital v. Burwell*,
807 F.3d 295 (D.C. Cir. 2015) ....................20, 21, 26

*Clarian Health W., LLC v. Hargan*,
878 F.3d 346 (D.C. Cir. 2017) ....................37

*Comcast Corp. v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) ....................41

**Comm'r v. Sunnen*,
333 U.S. 591 (1948) ....................16, 20, 21

*Cox v. Cox*,
457 F.2d 1190 (3d Cir. 1972) ....................29

*DaimlerChrysler Corp. v. United States*,
442 F.3d 1313 (Fed. Cir. 2006) ....................17

*De Csepel v. Republic of Hung*,
714 F.3d 591 (D.C. Cir. 2013) ....................33

*Democratic Cent. Comm. v. WMATA*,
842 F.2d 402 (D.C. Cir. 1988) ....................22, 33

*District Hospital Partners, L.P. v. Burwell*,
No. 16-528 (D.D.C. Nov. 18, 2016) ....................15

*District Hospital Partners, L.P. v. Sebelius*,
794 F. Supp. 2d 162 (D.D.C. 2011) ....................11, 15

*Durfee v. Duke*,
375 U.S. 106 (1963) ....................29

*Everitt v. Everitt*,
148 N.E.2d 891 (N.Y. 1958) ....................29

*Feldman v. Law Enforcement Associates Corp.*,
752 F.3d 339 (4th Cir. 2014) ....................44

*Flynn v. Veazey Constr. Corp.*,
310 F. Supp. 2d 186 (D.D.C. 2004) ....................9

*Fox TV Stations, Inc. v. FilmOn X LLC*,
966 F. Supp. 2d 30 (D.D.C. 2013) ........ 10

*Fund for Animals, Inc. v. United States BLM*,
460 F.3d 13 (D.C. Cir. 2006) ........ 38

*Gonzalez v. Banco Cent. Corp.*,
27 F.3d 751 (1st Cir. 1994) ........ 33

*Gulf Power Co. v. FCC*,
669 F.3d 320 (D.C. Cir. 2012) ........ 34, 35

*Hall v. Clinton*,
235 F.3d 202 (4th Cir. 2000) ........ 25

*Hall v. Clinton*,
285 F.3d 74 (D.C. Cir. 2002) (*see* Mot. 19) ........ 25, 26

*Harris v. Sec'y, U.S. Dep't of Veterans Affairs*,
126 F.3d 339 (D.C. Cir. 1997) ........ 45

*Hermes Consolidated, LLC v. EPA*,
787 F.3d 568 (D.C. Cir. 2015) ........ 38

*J.E. Bernard & Co. v. United States*,
66 Cust. Ct. 545 (1971) ........ 17

*Jerome Stevens Pharms, Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005) ........ 9

*Lee Mem'l Health Sys. v. Burwell*,
206 F. Supp. 3d 307, 326 (D.D.C. 2016) ........ 10

*In re Leopold*,
327 F. Supp. 3d 1 (D.D.C. 2018) ........ 26

*Limbach v. Hooven & Allison Co.*,
466 U.S. 353 (1984) ........ 16

*Lockhart v. Coastal Int'l Sec.*,
905 F. Supp. 2d 105 (D.D.C. 2012) ........ 13

*Lytle v. Household Mfg., Inc.*,
494 U.S. 545 (1990) ........ 14

*Maalouf v. Islamic Republic of Iran*,
923 F.3d 1095 (D.C. Cir. 2019) ........ 45

*Margolis v. U-Haul Int'l, Inc.*,
818 F. Supp. 2d 91 (D.D.C. 2011) ..... 15

*United States ex rel. Mathews v. HealthSouth Corp.*,
332 F.3d 293 (5th Cir. 2003) ..... 44

*Momenian v. Davidson*,
878 F.3d 381 (D.C. Cir. 2017) ..... 9

*Montana v. United States*,
440 U.S. 147 (1979) ..... 33

*In re Morgan Guaranty Trust Co.*,
269 N.E.2d 571 (N.Y. 1971) ..... 29

*Murphy v. Landsburg*,
490 F.2d 319 (3d Cir. 1973) ..... 29

*Natural Resources Defense Council v. EPA*,
513 F.3d 257 (D.C. Cir. 2008) ..... 17, 18, 20, 21

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ..... 42

*North v. Walsh*,
881 F.2d 1088 (D.C. Cir. 1989) ..... 14

*Northstar Financial Advisors, Inc. v. Schwab Investments*,
779 F.3d 1036 (9th Cir. 2015) ..... 43, 44

*Nuclear Energy Inst., Inc. v. EPA*,
373 F.3d 1251 (D.C. Cir. 2004) ..... 14, 28

*NVE, Inc. v. HHS*,
436 F.3d 182 (3d Cir. 2006) ..... 23

*Owner-Operator Independent Drivers Association v. FMCSA*,
494 F.3d 188 (D.C. Cir. 2007) ..... 35, 37

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*,
247 F. Supp. 3d 76 (D.D.C. 2017) ..... 35, 41, 42

*Patrician Plastic Corp. v. Bernadel Realty Corp.*,
256 N.E.2d 180 (N.Y. 1970) ..... 29

*Prasco, LLC v. Medicis Pharmaceuticals Corp.*,
537 F.3d 1329 (Fed. Cir. 2008) ..... 44

*Roche Palo Alto LLC v. Apotex, Inc.*,
531 F.3d 1372 (Fed. Cir. 2008)....................................................................................20

*Rudolph v. City Mgr. of Cambridge*,
167 N.E.2d 151 (Mass. 1960) ......................................................................................30

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) ...............................................................................43, 44

*Schmidt v. United States*,
749 F.3d 1064 (D.C. Cir. 2014) .....................................................................................44

*Schott Optical Glass v. United States*,
750 F.2d 62 (Fed. Cir. 1984)..........................................................................................17

*Sebelius v. Auburn Reg'l Med. Ctr.*,
568 U.S. 145 (2013).......................................................................................................45

*Securities Industries Association of America v. Board of Governors of the Federal Reserve System*,
900 F.2d 360 (D.C. Cir. 1990) .......................................................................................25

*Shands Jacksonville Medical Center v. Burwell*,
139 F. Supp. 3d 240 (D.D.C. 2015) ...............................................................................36

*Siegel v. Apergis*,
610 F. App'x 15 (2d Cir. 2015) .....................................................................................10

*Sierra Club v. EPA*,
356 F.3d 296 (D.C. Cir. 2004) .......................................................................................38

*Smalls v. United States*,
471 F.3d 186 (D.C. Cir. 2006) ..................................................................................14, 28

*Smith v. Bayer Corp.*,
564 U.S. 299 (2011).......................................................................................................23

*Stanton v. D.C. Ct. of Appeals*,
127 F.3d 72 (D.C. Cir. 1997).........................................................................................21

*In re Subpoena Duces Tecum*,
439 F.3d 740 (D.C. Cir. 2006) .......................................................................................13

**Taylor v Sturgell*,
553 U.S. 880 (2008)..........................................................................13, 33, 34, 35

**Tesoro Alaska Petroleum Co. v. FERC*,
234 F.3d 1286 (D.C. Cir. 2000) .....................................................................................17

*United States v. Hicks*,
283 F.3d 380 (D.C. Cir. 2002) .....43

**United States v. Stone & Downer Co.*,
274 U.S. 225 (1927) .....17, 19, 20, 21

*Yamaha Corp. of America v. United States*,
961 F.2d 245 (D.C. Cir. 1992) .....24, 25

**Statutes**

5 U.S.C. § 706 .....7, 23

26 U.S.C. § 6012 .....18

26 U.S.C. § 6072 .....18

26 U.S.C. § 6151 .....18

26 U.S.C. § 6201 .....18

26 U.S.C. § 6211 .....19

26 U.S.C. § 6213 .....18

26 U.S.C. § 6402 .....18

26 U.S.C. § 6654 .....18

26 U.S.C. § 6655 .....18

26 U.S.C. § 7421 .....19

26 U.S.C. § 7422 .....18

42 U.S.C. § 405 .....19

42 U.S.C. § 1395hh .....39

42 U.S.C. § 1395kk-1 .....2, 3

42 U.S.C. § 1395oo ..... *passim*

42 U.S.C. § 1985 .....25

**Other Authorities**

42 C.F.R. § 405.1803 .....3

42 C.F.R. § 405.1837 ....................24

42 C.F.R. § 412.84 ....................2

42 C.F.R. § 413.20 ....................2

70 Fed. Reg. 23,306 (May 4, 2005) ....................40

71 Fed. Reg. 47,870 (Aug. 18, 2006) ....................5, 39

78 Fed. Reg. 27,486 (May 10, 2013) ....................40, 41

78 Fed. Reg. 50,496 (Aug. 19, 2013) ....................7

84 Fed. Reg. 19,158 (May 3, 2019) ....................41

*B&B Hardware, Inc. v. Hargis Indus., Br. of Amicus Curiae*,
No. 13-352 (U.S. Sept. 11, 2014) ....................20

Fed. R. Civ. P. 8 ....................45

Fed. R. Civ. P. 12 ....................9, 33

Fed. R. Civ. P. 15 ....................42, 43, 44

Fed. R. Civ. P. 20 ....................30, 31

Fed. R. Civ. P. 23 ....................31

*Galen Hosp. Alaska, Inc. v. Azar*, Amicus Br.,
No. 18-728 (D.D.C. May 22, 2019) ....................30

*Galen Hosp. Alaska, Inc. v. Azar*, Response,
No. 18-728 (D.D.C. June 19, 2019) ....................30

*Galen Hosp. Alaska, Inc. v. Azar*, Mot. to Dismiss,
No. 18-728 (D.D.C. July 31, 2018) ....................31

*NRDC v. EPA*, Pet.'s Final Opening Br.
No. 07-1040 (D.C. Cir. Sept. 26, 2007) ....................21

Restatement (Second) of Judgments .................... *passim*

*Sarasota Mem'l Hosp. v. Azar*, Jt. Mot. to Remand,
No. 18-1031 (D.D.C. Nov. 16, 2018) ....................4, 5

## I. <u>Introduction</u>

Every year, hospitals across the country take care of patients in need of serious medical care, whose cases are far more expensive than the payments that the Medicare program ordinarily provides. Congress created the outlier payment program to reimburse hospitals for those cases. But for many years, the implementation of the outlier program by the Department of Health and Human Services ("HHS") has resulted in substantial underpayments.

In this case, a group of hospitals (the "Hospitals") contests the amount of their outlier payments for various hospital accounting years from 2006 through 2015. The Hospitals have pursued their claims patiently; they have complied with the complex administrative mechanisms established by the Medicare Act and by HHS regulations; they have waited for their claims to become ripe. Now HHS wants to foreclose substantive review of many of those claims.

The main defenses HHS presents in its Motion to Dismiss (ECF No. 139) ("Mot.") are claim and issue preclusion. Many of the Hospitals participated in prior litigation over other outlier payments, because the Medicare Act's review process staggers claims over time. In its eagerness to bar the Hospitals from court, HHS stretches preclusion doctrines beyond recognition, to the point that any hospital that is even affiliated with a hospital that has litigated some outlier payment issues before is now said to be barred from contesting *any* outlier payment issues regarding those years. As the Hospitals will show, HHS's concepts of claim and issue preclusion are contrary to the established law of those doctrines.

HHS also offers a smattering of other preliminary issues, including a jurisdictional objection buried in the middle of its Motion. On these, too, HHS has stretched the law far beyond what its authorities will support.

Finally, on the merits, HHS makes the startling suggestion, contrary to decades of D.C. Circuit precedent, that in a rulemaking that requires notice and comment, the agency need not provide notice of the key methods and facts supporting the rule because the methods are not themselves regulations applying directly to the public.

The Hospitals respectfully request that the Court deny HHS's Motion to Dismiss.

## II. Background

The Court is already familiar with much of the regulatory background regarding the Medicare outlier payments program, *see* Mem. Op., ECF No. 47, at 2-9; Mem. Op., ECF No. 57, at 2-5, and HHS's instant motion also provides a review, *see* HHS's Motion to Dismiss, ECF No. 139, at 3-9 ("Mot."). The Hospitals will mention only several additional important details.

### A. A Hospital Challenges Its Annual Reimbursement Through a Statutory Review Procedure

The Medicare program reimburses hospitals for unusually costly patient care by providing "outlier" payments. 42 U.S.C. § 1395ww(d)(5)(A). The amount of an outlier payment depends on figures set by HHS, such as standardized amounts for ordinary payments and the fixed loss threshold applicable at the time of the case, as well as hospital-specific figures such as a hospital's cost-to-charge ratio for the relevant period and the hospital's charges for the case. *See* 42 C.F.R. § 412.84(i), (k); Mot. 6 (describing the calculation of an outlier payment).

A hospital receives reimbursement payments on a rolling basis. At the end of a hospital's annual "cost reporting period"—usually the hospital's accounting year—it submits a "cost report" to a fiscal intermediary. *See, e.g.*, 42 C.F.R. § 413.20 (defining "cost reporting period"); 42 U.S.C. § 1395kk-1 (tasks of fiscal intermediaries, now known as "medicare administrative contractors"). The fiscal intermediary audits the cost report to determine total program reimbursement due to the hospital. The fiscal intermediary issues its determination of total

program reimbursement in a Notice of Program Reimbursement ("NPR"). 42 U.S.C. § 1395kk-1(a)(4)(A); 42 C.F.R. § 405.1803. The total payment due to the hospital for the year may be greater or less than the amount that the hospital has already received throughout the year. Accordingly, the hospital then receives a final payment or pays a refund. 42 C.F.R. § 405.1803(c).

If a hospital is dissatisfied with its NPR, it may appeal to the Provider Reimbursement Review Board ("PRRB"), an administrative body established by statute for such appeals. 42 U.S.C. § 1395oo(a). For an appeal to the PRRB to lie, the hospital must have "filed a required cost report within the time specified in regulations," and the appeal is "with respect to such cost report." *Id*. The hospital must file the appeal within 180 days of the NPR or, if the fiscal intermediary fails to make a timely determination on a properly filed cost report, the hospital may appeal within 180 days after the date the NPR was due. *Id.*[1] The PRRB has the power "to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report." § 1395oo(d).

A hospital has a right to sue for judicial review within 60 days of a PRRB decision. § 1395oo(f). A provider can also "obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the [PRRB] determines . . . that it is without authority to decide the question." § 1395oo(f). The PRRB can make that determination, called an authorization for Expedited Judicial Review ("EJR"), *sua sponte* or at a hospital's request. *Id.* This form of judicial review is through an

[1] There are several other routes to a PRRB appeal not relevant here; they are also all based on annual cost reports. *E.g.* 42 U.S.C. § 1395oo(a)(1)(A)(ii).

action under the same statutory provision.[2] Courts review PRRB or fiscal intermediary decisions under "the applicable provisions" of the Administrative Procedure Act ("APA"). *Id*.

The outlier reimbursement for a given case depends on, among other things, both the applicable cost-to-charge ratio for that hospital and the fixed loss threshold applicable at the time of the case. HHS sets the threshold each year for the coming federal fiscal year ("FY"), which runs from October 1 through the following September 30. Consequently, if a hospital's cost reporting period is on a different schedule, a given cost report and annual reimbursement will involve patient cases subject to two different thresholds: one from the FY that covered the first part of the cost reporting period, and one from the following FY.

### B. <u>The Hospitals Have Challenged Their Annual Reimbursements In a Series of Cases</u>

Over the years, hospitals dissatisfied with their annual reimbursements for outlier cases have proceeded through the appeal and review process described above: filing cost reports, awaiting NPRs, appealing to the PRRB, and filing court actions. Due in part to several improper procedural obstacles that HHS and the PRRB erected, many hospitals were barred for some time from presenting claims regarding some of their cost reports. Claims in *Sarasota Memorial Hospital v. Azar*, now consolidated under the caption above, illustrate the phenomenon. The PRRB twice dismissed the appeals for various procedural defects.[3] HHS did not attempt to defend those dismissals in court, and HHS eventually determined that the PRRB does have jurisdiction over the *Sarasota* cost reports. *See* Joint Mot. for Remand, *Sarasota Mem'l Hosp. v.*

---

[2] If the PRRB does not respond within 30 days of a hospital's request for EJR, the hospital may file the civil action within 60 days after that deadline passes. 42 U.S.C. § 1395oo(f)(1).

[3] The *Sarasota* claims involve several hospital cost reports for which the PRRB noted different grounds for dismissal. The Hospitals present the most common ground here simply to illustrate some of the reasons there has been a series of cases. The jurisdictional issues that the PRRB noted have all been resolved.

*Azar*, No. 18-1031, ECF 12, p.2 (D.D.C. Nov. 16, 2018) (confessing error). Still, those hospitals did not receive EJRs until March 2019. Issues like these, as well as the natural variation in timing, with earlier cost reports going through the review process sooner, have led various hospitals to present their cost-report claims regarding outlier payments in several different cases.

*Banner*: In this case, 29 hospitals presented claims on cost reporting periods ranging from 1998 through 2006. Because of the overlap of cost reporting periods and federal fiscal years noted above, these claims raised questions regarding thresholds established for FYs 1998 through 2007. Not every hospital contested each threshold rule, because the Medicare Act and regulations barred various hospitals, as a result of issues like those described above, from presenting some cost-report appeals.

The D.C. Circuit held that because HHS's threshold-setting method is built on the premise that charges increase faster than costs, logically HHS needed to estimate decreases in cost-to-charge ratios when it forecasted what payments a given threshold would produce. HHS had not done that in the FY 2004 through 2006 rulemakings. *Banner Health v. Price*, 867 F.3d 1323, 1348-50, 1352 (D.C. Cir. 2017). The district court remanded those rules to HHS for further consideration but retained jurisdiction over the case. On June 6, 2019, HHS published a document purporting to explain why it did not estimate decreases in cost-to-charge ratios in those rules. The *Banner Health* plaintiffs remain engaged in litigation to challenge that explanation.

For FY 2007, HHS did estimate decreases, using a novel and complex method to derive a "CCR adjustment factor." HHS's rulemaking proposal had not disclosed that it was considering adopting any adjustment factor and HHS gave the public no opportunity to comment on its method. *See* FY 2007 Final Rule, 71 Fed. Reg. 47,870, 48,150 (Aug. 18, 2006). *Banner Health* "sanctioned . . . the facial validity" of that method in the face of certain arbitrary-and-capricious

challenges presented in that case. *Billings Clinic v. Azar*, 901 F.3d 301, 313-14 (D.C. Cir. 2018) (citing *Banner*, 867 F.3d at 1356). However, the D.C. Circuit did not consider whether the FY 2007 rulemaking was procedurally defective, as the Hospitals allege here. *See, e.g.*, Am. Cmpl., ECF No. 113, at ¶ 99.

*Billings* (*Lee Memorial* at the district court): Some of the hospitals that appeared in *Banner* brought claims on 2007 through 2010 reporting periods. Because of the overlap of cost reporting periods and federal fiscal years, these claims involved questions regarding the thresholds for FY 2007 through 2011. The plaintiffs raised three challenges: (1) HHS failed to disclose a 2003 draft rule containing information relevant to subsequent rule making; (2) HHS should have considered the impact of outlier reconciliation when setting the thresholds; and (3) HHS's use of its method for adjusting cost-to-charge ratios was arbitrary and capricious. 901 F.3d at 313. The D.C. Circuit affirmed summary judgment for HHS. The court concluded it could dispose of the first and second challenges based on in *Banner*. *Id*. For the third, the Court recognized that "a methodology used for prediction can look more arbitrary the longer it is applied," but held that HHS had not yet crossed the line because it had limited and unsettled data on how accurate its thresholds had been. *Id.* at 314.

*The Consolidated Cases*: These cases present claims on cost reporting periods ranging from 2006 through 2015. Most of the cases were stayed pending the D.C. Circuit's mandates in *Banner* and *Billings*. After those mandates issued, the Court consolidated the cases.[4] Meanwhile, on December 10, 2018, the plaintiffs in the *University of Colorado* case (the oldest

---

[4] *See* Order, ECF No. 108, (Dec. 19, 2018); Order, ECF No. 112 (Feb. 15, 2019); Minute Entry (Mar. 22, 2019); Order, ECF No. 131 (April 1, 2019).

of the consolidated cases) filed a notice identifying matters that they no longer intended to pursue in light of the D.C. Circuit decisions, ECF No. 107 ("Notice").

### C. The Hospitals' Annual Reimbursements Were Too Low Because of Defects in HHS's Threshold-Setting Rules

The Hospitals will show that HHS's rulemakings setting the fixed loss thresholds during FYs 2012 through 2016, which governed the Hospitals' outlier payments for their cost reporting years at issue, were performed in a manner that is contrary to the Medicare Act and the intent of Congress and were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C).[5] *See, e.g.*, Am. Cmpl., ECF No. 113, at ¶ 93. The fixed loss thresholds for FYs 2007 through 2013 were also unlawful because HHS promulgated them "without observance of procedure required by law." § 706(2)(D). *See* Am. Cmpl., ECF No. 113, at ¶¶ 95-103.

The Hospitals will also show that HHS's rulemakings in FYs 2012 and 2013 were arbitrary and capricious because HHS ignored six years of data, described by commenters, showing the adjustment factor for cost-to-charge ratios was a poor and unreliable model. It was not until FY 2014 that HHS finally considered and agreed with the commenters "that the use of historical data to adjust the CCRs is simpler and is consistent with CMS' estimation of charge inflation." *See* FY 2014 Final Rule, 78 Fed. Reg. 50,496, 50,978 (Aug. 19, 2013).

## III. Summary of the Argument

Although HHS buried its jurisdictional argument in the middle of the Motion, the Court must consider that argument first. HHS says an EJR that authorizes litigation on whether a given

[5] In alleging that these thresholds were arbitrary and capricious, the Hospitals do not intend to present arguments that foreclosed by the law of the circuit established in *Banner* or *Billings*.

threshold was "substantively and/or procedurally invalid" does not permit arguments that the notice-and-comment procedure for the threshold-setting rule was deficient. HHS bases that argument on the court's treatment, in a different case, of a different EJR that presented the question whether a given threshold was "arbitrary and capricious." The EJR in these cases is obviously more expansive and covers notice-and-comment objections.

The Hospitals' procedural contentions should not be barred by claim preclusion. The Court previously (in the *University of Colorado* case) treated the *Banner* and *Billings* "claims," for preclusion purposes, as being APA challenges to the threshold rules. As explained below, this treatment is in significant tension with longstanding precedent, and it would create unfair disparities in the administration of Medicare, of a sort the Supreme Court has long warned about. In multiple contexts, such as taxation, each transaction gives rise to a new cause of action, even if the underlying regulations causing concern remain the same. It should follow that each Medicare cost report gives rise to a separate cause of action. To the extent necessary, the Hospitals ask the Court to reconsider its prior interlocutory ruling on this point.

Regarding issue preclusion, HHS is mistaken about what constitutes an "issue" to be precluded; about which issues may preclude a party to a case; and about when a nonparty may be precluded. HHS's arguments are contrary to statements that the Department of Justice has made, and contrary to HHS's own previous position in this litigation.

HHS also tries to pick off a few hospital cost reports by means of a technical argument about the difference between amendments and supplementation under the Federal Rules. Several courts of appeals have already held that the technicality HHS focuses on should be ignored.

Finally turning to the merits, HHS's arguments depend on a straw man it has built, that the Hospitals believe HHS adopted a rule that needed "separate notice and comment" about how

to model cost-to-charge ratios. The Hospitals have said no such thing; notice and comment within the threshold rulemakings would have been acceptable. The Hospitals' view is simple: When HHS selects a threshold, one of the key steps in its analysis is its prediction of what cost-to-charge ratios will be in the coming year; so when HHS substantially changes how it makes that prediction, it needs to expose the new method for public comment. That position is consistent with established circuit precedent about rulemaking, with the Medicare Act, with HHS's ordinary practices, and with what the *Banner* and *Billings* plaintiffs argued.

## IV. Legal Standard

A district court deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) must accept all of the complaint's allegations as true and must draw all reasonable inferences in the plaintiff's favor. *Momenian v. Davidson*, 878 F.3d 381, 387 (D.C. Cir. 2017). If the allegations plausibly demonstrate that the plaintiff may be entitled to relief, dismissal is not appropriate. *Id.* at 390. The standard for dismissal under 12(b)(1) for a lack of subject-matter jurisdiction is similar. Dismissal under Rule 12(b)(1) is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim . . . ." *Flynn v. Veazey Constr. Corp.*, 310 F. Supp. 2d 186, 190 (D.D.C. 2004). "[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction, . . . [but] the court must still accept all of the factual allegations in [the] complaint as true." *Jerome Stevens Pharms, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## V. Argument

### A. The Court Has Jurisdiction to Consider All the Disputes Raised in These Cases.

HHS says the Court lacks jurisdiction to decide whether HHS set the FY 2007-2013 thresholds without proper notice-and-comment procedures, because (says HHS) this question is not within the scope of the EJRs that the Hospitals received. The Court must consider this

contention before any other in HHS's Motion, because even HHS's preclusion defenses "go to the merits of a claim, which a court cannot adjudicate in the absence of jurisdiction." *Siegel v. Apergis*, 610 F. App'x 15, 16 (2d Cir. 2015). Yet the Court should note that the juxtaposition of HHS's jurisdictional and preclusion arguments is deeply ironic. The EJRs here are essentially identical to the EJRs that the plaintiffs received in *Banner* and *Billings*. *Cf. Banner Health v. Burwell*, 126 F. Supp. 3d 28, 66 (D.D.C. 2015) (quoting EJRs); *Lee Mem'l Health Sys. v. Burwell*, 206 F. Supp. 3d 307, 326 (D.D.C. 2016) (same). So HHS evidently contends—in a single motion—both that *Banner* and *Billings* decided the questions that the Hospitals now raise (giving rise to preclusion), and that those questions are outside the scope of what the *Banner* and *Billings* courts were permitted to decide.

In fact, the EJRs in those cases, like those here, encompassed a range of issues, anything establishing whether a given fixed loss threshold is "substantively and/or procedurally invalid." *See Banner*, 126 F. Supp. 3d at 66 (EJRs were "framed broadly"); *Lee*, 206 F. Supp. 3d at 326 (describing EJR as "very broad"). These cases are telling about HHS's current jurisdictional argument. In *Banner*, the plaintiffs, raising claims over their 2003 cost reports, argued that a mid-2003 rule should have adjusted the applicable threshold. HHS moved to dismiss because it said the plaintiffs' requests for EJR had mentioned only specific pages of the mid-2003 rule, and not those that discussed the possible adjustment. Def's Memo., attached to Bradley Affidavit as Ex. A, at 33.[6] The court rejected that argument because the EJRs were "framed broadly" and encompassed all questions about the validity of the mid-2003 rule. 126 F. Supp. 3d at 66-67.

---

[6] The relevant portion of HHS's *Banner Health* brief is attached as an exhibit here. The Court can take judicial notice of HHS's position therein. *See Fox TV Stations, Inc. v. FilmOn X LLC,* 966 F. Supp. 2d 30, 42-43 (D.D.C. 2013).

HHS was represented in that case by the same counsel that filed HHS's motion here, and HHS presented the same arguments about the *Banner* EJR that it offers this Court. In fact the *text* of the arguments is actually identical. *See* Ex. A. Yet HHS presents those arguments again without informing the Court that *Banner* rejected them. This, too, is ironic, given that HHS is invoking preclusion against various hospitals based on the *Banner* case.

First, HHS relies on *District Hospital Partners, L.P. v. Sebelius*, 794 F. Supp. 2d 162 (D.D.C. 2011), which decided that a given question was outside the scope of the EJR in that case. Mot. 29-30; *cf.* Ex. A at 31-32. As *Banner Health* explained, the *District Hospital Partners* EJR was much narrower. 126 F. Supp. 3d at 66. It covered only "whether the various elements used to project the outlier thresholds were arbitrary and capricious.'" 126 F. Supp. 3d at 66 (quotation omitted). Moreover, that EJR covered several FYs' threshold rules, and the plaintiffs then sought to challenge a threshold from a different FY. The EJRs here were similar to the *Banner*, not the *District Hospital*, EJRs. And, just as in *Banner*, the plaintiffs are disputing a policy embedded in the thresholds that the EJRs address.

Second, HHS says an EJR can encompass only the "particular questions of law . . . identified in the provider's request for [EJR]." Mot. 28; *cf.* Ex. A at 30-31. *Banner* refused to "read the Plaintiffs' request so narrowly so as to exclude a challenge" to one aspect of the mid-2003 rule simply because they did not recite it as particularly as HHS demanded. 126 F. Supp. 3d at 66. So too here. The policy to which the Hospitals object—a policy about how to forecast cost-to-charge ratios when setting a fixed loss threshold—was established in the very same FY 2007 rule that the relevant EJRs cover. HHS relied on that policy, in each of the FYs 2007-2013 rules, as part of the basis for deciding the threshold. The EJR-approved question of whether

those thresholds were "procedurally valid" easily encompasses the Hospitals' contention that notice and comment on the thresholds was deficient with respect to this policy.

Furthermore, HHS's argument, that an EJR must be based on what "particular question of law" the provider identified in its request for EJR (Mot. 28-29), has no basis in the relevant statute or regulations. HHS cites no authority for its argument. The regulation does not support HHS's inference, because the language HHS quotes refers to the PRRB's grant of EJR, not the provider's request. *See* Mot. 28 (quoting 42 C.F.R. § 405.1842(g)(2)). And the statute points the other way. The PRRB can grant EJR "on its own motion." 42 U.S.C. § 1395oo(f)(1). Thus, the PRRB could grant EJR without a provider's request, or on a question entirely different from what the provider requested. It can presumably also grant EJR with a scope different from what the provider requested. "The statute conditions expedited judicial review in the district court on the existence of that no-authority determination," *Allina Health Servs. v. Price*, 863 F.3d 937, 941 (D.C. Cir. 2017), not on whether or what the hospital proposed for the EJR determination.

**B. <u>There are No "Abandoned Claims" Subject to Dismissal</u>**

HHS's first merits-based argument is that the Hospitals have "abandoned" some claims and yet those claims are somehow still available to be dismissed. Mot. 15. The source for HHS's notion of abandonment is the Hospitals' December 2018 Notice. HHS cites no authority or any basis in law for the proposition that such a notice of *future* intent is binding, or that it had the effect itself of withdrawing claims.

To the contrary, the Hospitals said they "intend[ed] to submit appropriate filings to effect the . . . relevant withdrawals." Notice, ECF No. 107, at 7. They have done so. The amended complaints in the Consolidated Cases say explicitly that the Hospitals are not presenting issues foreclosed by circuit precedent, and they concede that circuit precedent forecloses their

challenges to the mid-2003 rulemaking. *See, e.g.*, Am. Cmpl., ECF No. 113, at ¶ 93 n.7; *see also* Tr. of Status Conference, ECF No. 130, at 13:13–16.

To be sure, the Hospitals are continuing to pursue certain challenges, not foreclosed by circuit precedent, that could be understood to be among those the Notice said they intended to withdraw. Dismissing those claims over the Hospitals' opposition would be "an extremely harsh sanction," one used as a "last resort" in cases of "egregious conduct." *Lockhart v. Coastal Int'l Sec.*, 905 F. Supp. 2d 105, 113 (D.D.C. 2012). HHS has not ventured to suggest any misconduct at all, nor have the Hospitals engaged in any. The Hospitals prepared the Notice in good faith, and have since determined that HHS cannot prevail on its affirmative defense of claim preclusion, *see infra*, at 14-21. The amended complaints appropriately press those issues.

## C. The Amended Complaints Present No Claims or Issues that Are Precluded

HHS mixes and matches claim preclusion and issue preclusion, two doctrines with different scope and function, to create a heads-I-win-tails-you-lose game that is actually contrary to the rules of both. HHS's arguments are contrary to its prior position in this case, as HHS acknowledges; they are also contrary to what the Department of Justice has said before in other contexts. Those departures are a good sign that HHS's adventurous new arguments are incorrect. More simply, HHS has not met its burden to show that either preclusion doctrine applies. *See In re Subpoena Duces Tecum*, 439 F.3d 740, 743 (D.C. Cir. 2006) (party asserting preclusion has burden to prove it applies).

HHS's defenses run contrary to the main purposes of preclusion: to "protect against the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Taylor v Sturgell*, 553 U.S. 880, 892 (2008) (alterations in original). There are plaintiffs challenging the various threshold rules whose claims are indisputably not subject to any form of preclusion.

Even if the Court granted all of HHS's defenses, HHS would still be litigating, and the Court deciding, the same issues regarding the rules. The additional burden on judicial resources comes from adjudicating HHS's defenses. The Court should not stretch the law of preclusion as HHS proposes, in a situation where "the purposes served by [preclusion] do not justify applying the doctrine." *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 553 (1990).

To make the issues more concrete, consider a hypothetical Hospital X that was a plaintiff in *Billings Clinic*, where it litigated over its 2007 cost report. Hospital X's cost reporting period aligns with the calendar year, so its 2007 reimbursement depended on the FY 2007 and 2008 thresholds. Now Hospital X is appealing its 2008 cost report—which implicates the FYs 2008 and 2009 fixed-loss thresholds.

Under ordinary *claim* preclusion principles, Hospital X's appeal is barred if it "involv[es] the same claims or cause of action" as a previous case "between the same parties or their privies"; and that case proceeded to "a final, valid judgment on the merits . . . by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006). Under ordinary *issue* preclusion rules, Hospital X cannot dispute an issue if "the same issue" was "contested by the parties and submitted for judicial determination in the prior case"; the issue was "actually and necessarily determined"; and issue preclusion would "not work a basic unfairness." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1303 (D.C. Cir. 2004).

HHS says the claim Hospital X brought in the earlier suit was that the FY 2007 and 2008 rules were invalid, so that *claim* preclusion bars any further challenge to those rules; and at the same time the issue *Billings* decided was whether the rules were invalid, so *issue* preclusion also bars any further challenge to those rules. Mot. 18-19. It would be unusual for the claim in a case to be coextensive with the issues. *See North v. Walsh*, 881 F.2d 1088, 1095 (D.C. Cir. 1989)

("This characterization is overbroad; it swells the concept 'issue' so that the term becomes virtually synonymous with 'demand for relief.'"). HHS further argues that Hospital X is barred from contesting any rule that any *other* hospital challenged in *Billings*. Mot. 21-22.

1. <u>The claims presented in *Banner* and *Billings* were claims to full and proper payment on cost reports</u>

HHS relies on the Court's decision that it would not be futile for HHS to present a preclusion defense because "the underlying challenge to the FY 2007 rule defines the claim." Mem. Op., ECF No. 89, at 9, 12; *see* Mot. 18. HHS offers little additional support for its claim-preclusion defense—simply a citation to the dismissal of claims in *District Hospital Partners, L.P. v. Burwell*, No. 16-528 (ESH) (D.D.C. Nov. 18, 2016). Mot. 18-19. In doing so, HHS extrapolates a decision that the court never made, on a question that was not even raised. The plaintiffs in *District Hospital Partners* renewed litigation over the *same cost reports* they had previously brought to the court. The court had no occasion to consider whether the scope of a claim is truly the cost report, or the rule that affected part of the calculation in a cost report.

This Court recognized, when it permitted HHS to raise its preclusion defense, that it was not deciding "the merits of any preclusion claim." Mem. Op., ECF No. 89, at 9. The Court has full discretion to revisit its analysis, *see Margolis v. U-Haul Int'l, Inc.*, 818 F. Supp. 2d 91, 99 (D.D.C. 2011) ("[D]enial of a motion to dismiss is an interlocutory order" that is "not subject to law of the case doctrine and may always be reconsidered prior to final judgment."); and the Court should do so, because there are important precedents that it did not consider.[7]

In the Medicare system, a hospital engages repeatedly with the same regulatory regime to determine its reimbursement for various patient cases and other services. In this context, the

[7] In addition, many plaintiffs in the Consolidated Cases are not parties to *University of Colorado* and should not be adversely affected by motions litigated in that case before consolidation.

"nucleus of facts" delineating the claim is the dispute over reimbursement. Medicare reimbursement appeals should be governed by the principles applicable in several highly analogous situations.

*Income tax.* In income tax disputes, the claim is the tax return, not the underlying regulation. *See Comm'r v. Sunnen*, 333 U.S. 591, 598-99 (1948). In *Sunnen*, a taxpayer received royalties that he then paid to his wife from 1928 to 1941. The first case involved the taxpayer's liability for 1928 through 1931. The Board of Tax Appeals held that the amounts paid to his wife were not part of the taxpayer's income. When the government later asserted that the royalties for years 1937 through 1941 were part of the taxpayer's income, courts held that argument barred by *res judicata*. The Supreme Court clarified:

> Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action. Thus if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is res judicata as to any subsequent proceeding involving ***the same claim and the same tax year***. But if the later proceeding is concerned with a similar . . . claim relating to a different tax year, the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit.

*Id.* (emphasis added). Thus, when a person presents a case involving a different tax year, that case cannot be subject to claim preclusion based on a previous tax year.[8]

*Customs*. In the customs context, each shipment, even of identical goods, gives rise to a fresh claim about the tariff to be applied. The Supreme Court long ago adopted the principle that

[8] Although this Court has held that *Sunnen* has been narrowed with respect to a different principle it set forth—the "separable facts" doctrine, *see Am. Med. Int'l, Inc. v. Sec'y of Health, Educ. & Welfare*, 677 F.2d 118, 120 (1981), the first aspect of *Sunnen* remains good law. *See, e.g.*, *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 362 (1984) ("The years involved in this tax case, however, are not the same tax years at issue in *Hooven I*. Because of this, *Commissioner v. Sunnen*, *supra*, is pertinent and, indeed, is controlling."); *Burlington N. Santa Fe R.R. v. Assiniboine & Sioux Tribe*, 323 F.3d 767, 770 (9th Cir. 2003) ("The core of *Sunnen* is the holding that tax cases by their nature raise different *claims* concerning different tax years, although the *issues* may be precisely the same.").

"the construction of the statute and classification thereunder, as against an importer, [is] not res judicata in respect of a subsequent importation involving the same issue of fact and the same question of law." *United States v. Stone & Downer Co.*, 274 U.S. 225, 233-334 (1927); *see also Schott Optical Glass v. United States*, 750 F.2d 62, 64 (Fed. Cir. 1984); *Aves. in Leather, Inc. v. United States*, 317 F.3d 1399, 1403 (Fed. Cir. 2003) ("[E]ach new entry is a new classification cause of action, giving the importer a new day in court.").[9]

*Ratemaking*. In *Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286 (D.C. Cir. 2000), the Federal Energy Regulatory Commission ("FERC"), which "controls" the tariffs for oil pipelines, approved a formula accounting for variations in oil quality. Two shippers lost one challenge and then, after additional shipments, attempted another challenge. FERC rejected it for failure to show changed circumstances. The D.C. Circuit reversed because the previous decision was not claim-preclusive: "A rate order is not *res judicata* . . . , so each new shipment by a carrier gives rise to a new cause of action." *Id*. at 1296.

When this Court allowed HHS to amend its answer, it relied entirely on *Natural Resources Defense Council v. EPA*, 513 F.3d 257, 261 (D.C. Cir. 2008), which the Court said establishes that "the underlying challenge to the FY 2007 rule defines the claim." Mem. Op., ECF No. 89, at 12. The discussion above shows that the principle drawn from *NRDC v. EPA* is not absolute or unqualified. If a court followed *NRDC v. EPA* to bar a later tax case raising a

[9] *Stone & Downer* actually established two principles, one for claim preclusion and one for issue preclusion ("collateral estoppel"). The case held that a classification decision does not even preclude the importer on the *issues* at stake. *J.E. Bernard & Co. v. United States*, 66 Cust. Ct. 545, 548-50 (1971). That principle is limited to certain types of customs cases, *see id.* at 550; but the notion that a new import gives rise to a new claim is general. *See DaimlerChrysler Corp. v. United States*, 442 F.3d 1313, 1321 (Fed. Cir. 2006) ("Importers thus may intentionally omit related protests from a summons to preserve the opportunity to relitigate the issues in a later suit.").

second challenge to a tax regulation, or a later import protest raising a second challenge to a Customs ruling, it would contravene Supreme Court precedent. And if a court applied *NRDC v.* EPA to a second challenge to FERC ratemaking, it would run afoul of *Tesora Alaska*—which, as it happens, was written by the same judge that wrote *NRDC v. EPA*.

The Hospitals' claims are much more like tax disputes than like the claim in *NRDC v. EPA*:

- The structure of the claims bears a strong resemblance to tax disputes. A taxpayer pays taxes on a rolling basis over the year, 26 U.S.C. §§ 6654, 6655, and then files a tax return each year reporting the taxpayer's overall tax liability, based on the taxpayer's details and the applicable rules, 26 U.S.C. §§ 6012, 6072. The Internal Revenue Service reviews the return and determines for itself the taxpayer's total liability, and a tax return then leads to a final payment or a refund to align the taxpayer's total payment with that year's total liability. 26 U.S.C. §§ 6201(a)(1), 6151, 6402. Similarly, a hospital receives Medicare reimbursements on a rolling basis, and then files a cost report at the end of the year. A fiscal intermediary reviews the cost report and determines whether the hospital's claim is correct, and the cost report leads to a final payment or refund. *See supra*, at 2.

- Both types of dispute are channeled through administrative processes that lead to a special statutory judicial review. A taxpayer must present a claim to the IRS for refund. 26 U.S.C. § 7422(a). If the IRS refuses the request, a taxpayer may commence an action, or he or she may, within 90 days of receiving a notice of deficiency, petition the administrative Tax Court for review. 26 U.S.C. § 6213(a). The Medicare Act channels disputes over reimbursement similarly—in fact in even more detailed ways. A hospital must present a cost report to its fiscal intermediary, and proceed through the process of administrative appeals of its cost report. 42

U.S.C. § 1395oo(a), (f). If the hospital remains dissatisfied with the outcome of the administrative process, the hospital may seek judicial review within 60 days of the PRRB's (or the Secretary's) decision. § 1395oo(f).

- The statutory review provisions frame both types of dispute in terms of the annual payment and reimbursement processes. Under the Tax Code, the disputes are claims for refunds or notices that the liability on an annual return was deficient. *E.g.* 26 U.S.C. § 6211 (defining deficiency). Medicare Act cases like this one are appeals on annual cost reports: A hospital may seek judicial review of a decision of the PRRB, and the PRRB in turn only has jurisdiction over a cost report or the related NPR. *See supra*, at 3-4.

- No other suit over tax liability is permissible, and no other suit over reimbursement is permissible. 26 U.S.C. § 7421 (tax); 42 U.S.C. § 405(h), 1395oo(f) (Medicare).

Perhaps even more important is that a Medicare reimbursement dispute involves exactly the same concerns that motivated the Supreme Court to conclude that one year's tax case is not claim-preclusive of another year's and one import protest is not claim-preclusive for another shipment. Regarding customs disputes, the Court reasoned that

> [I]f the first decision were against a large importing house, and its competitors instituted subsequent litigation on the same issues, with new evidence or without it, and succeeded in securing a different conclusion, the first litigant, bound by the judgment against it in favor of the Government, must permanently do business in importations of the same merchandise at great and inequitable disadvantage with its competitors.

*Stone & Downer,* 274 U.S. at 236. Similarly for taxes,

> A taxpayer may secure a judicial determination of a particular tax matter, . . . [but] a subsequent modification of the significant facts or a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes. If a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class. As a result,

> there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion.

*Sunnen*, 333 U.S. at 599.

The same concern is present for Medicare reimbursement cases. If a hospital loses a challenge to a rule while disputing one year's cost report, applying claim preclusion to that challenge would mean the hospital is subject to the rule forevermore, even if a court later decides the rule is invalid. Of course, issue preclusion may still apply. But claim and issue preclusion differ in a respect that was critical to *Sunnen* and *Stone & Downer*. Issue preclusion "is a doctrine capable of being applied so as to avoid an undue disparity in the impact of income tax liability," 333 U.S. at 599, because if the law changes then an issue may no longer be precluded, *id*. at 599-600. By contrast, "there is no 'change of law' or fairness exception to prevent application of claim preclusion." *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1380 (Fed. Cir. 2008). It would be unfair and illogical for the judicial system to enforce such a discriminatory reimbursement regime.

*Canonsburg General Hospital v. Burwell*, 807 F.3d 295 (D.C. Cir. 2015), is a useful illustration. In a first lawsuit, the hospital contested, unsuccessfully, its 1987-1990 and 1993 cost reports, in part on grounds that guidance in an HHS manual was invalid. *Id.* at 298-99. A second lawsuit made the same arguments about that provision, in the course of a dispute over the hospital's 1996 cost report. Had the D.C. Circuit followed *NRDC v. EPA*, that second lawsuit would have been barred simply by claim preclusion. And the hospital would be stuck with the contested provision even if courts later barred its application to everybody else.[10] Instead, the

[10] In fact, the Sixth and Eighth Circuits ended up splitting about whether the relevant provision was invalid. *See Canonsburg*, 807 F.3d at 307 n.14.

D.C. Circuit applied issue preclusion, after assessing whether there had been intervening court decisions that would justify the "change in law" exception to issue preclusion. *Id.* at 307.

Against the straightforward analogy to situations like tax disputes, *NRDC v. EPA* is inapposite. Indeed, the D.C. Circuit has already identified the critical distinction: "[E]ach successive *enforcement* of a statute . . . creates a new cause of action." *Stanton v. D.C. Ct. of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997) (emphasis added). The concept of *enforcement*—a succinct summary of *Sunnen* and cases like it—is critical. What is at stake here is truly the enforcement of HHS rules. A hospital would like to receive more for an outlier case, but it cannot claim or receive more because the fiscal intermediary enforces the fixed loss thresholds that HHS sets. By contrast, in *NRDC v. EPA*, the agency had applied its general rule to decide an annual exemption; but neither NRDC nor its members were subject to the rule or the exemption, so there was no fresh enforcement. The D.C. Circuit noted that "[n]one of the underlying facts have changed." *NRDC v. EPA*, 513 F.3d at 261. Indeed, NRDC's asserted injury was simply the continuation of the health risks created by increased ozone depletion resulting from the policy NRDC had originally challenged. *See* Final Opening Br., *NRDC v. EPA*, No. 07-1040, pp. 2-3 (D.C. Cir. Sept. 26, 2007) ("This Court held in [the previous case] that NRDC has standing to challenge EPA's methyl bromide exemption rule for 2005. As a result, NRDC's standing to challenge EPA's exemption rule for 2007 is self-evident."). Here, a fact has changed, in that the hospitals have been subject to a given rule with respect to a different annual reimbursement. Under *Stanton*, that fact is critical for delineating the cause of action.

It would be contrary to *Sunnen*, *Stone & Downer*, and many other precedents to hold that a hospital must be governed by a rule that turns out to be invalid, simply because the hospital contested the rule in a previous reimbursement appeal. Thus, the example Hospital X, which in

*Billings* brought a claim on its 2007 cost report, is not barred by claim preclusion from raising a claim over its 2008 cost report, including a challenge to the FY 2008 threshold that affects the 2008 reimbursement.

2. Neither *Banner* nor *Billings* decided an "issue" as expansive as the overall validity of HHS's rules; and HHS has not identified any issue being litigated that may be precluded

The Department of Justice has said that "[f]or issue preclusion to apply, the first tribunal must have decided the *precise* issue for which preclusion is sought in the second tribunal." Br. of the United States as *Amicus Curiae*, *B&B Hardware, Inc. v. Hargis Indus.*, No. 13-352, p. 34 (U.S. Sept. 11, 2014) (emphasis added). Even when two cases are addressing questions that are nominally the same, it will "not always . . . be the case" that the issues are "identical," *id*., and careful analysis is necessary.

Instead, HHS now asserts, without any analysis, explanation, or authority, that the "issue" that *Banner* and *Billings* preclude is "[t]he validity of the fixed loss threshold rule for each year." Mot. 19. That issue is not at all "precise," and HHS offers no evidence or analysis showing the *Banner* and *Billings* case considered such a broad question as whether the rules were "valid." *Cf. Billings* ("[T]he primary question before us is whether the Department's decision to continue with its methodology after the 2007 fiscal year was arbitrary."). This defect alone dooms HHS's defense, because HHS has the burden to show that the prior decisions conclusively determined an issue presented in this case. *See Democratic Cent. Comm. v. WMATA*, 842 F.2d 402, 409-11 (D.C. Cir. 1988).

"[I]ssue preclusion applies where 'the issues in the two cases are indeed *identical*.'" *B&B Hardware, Inc. v. Hargis Indus.*, 135 S. Ct. 1293, 1306 (2015) (emphasis added). "[I]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." *Id.* In *B&B Hardware*, the Court

proceeded to a careful analysis of whether the legal standard for "likelihood of confusion" is materially the same in a judicial action as in the agency process. Similarly, in *Smith v. Bayer Corp.*, 564 U.S. 299, 309 (2011), the Court noted that while "the substantive claims in . . . two suits broadly overlapped," and the two courts were both deciding whether to certify classes under similar-sounding procedural rules, there could be no issue preclusion "[i]f those two legal standards" actually differ.

Application of the principles from *B&B Hardware* is straightforward here. In *Billings*, "the primary question before us is whether the Department's decision to continue with its methodology after the 2007 fiscal year was arbitrary." *Billings*, 901 F.3d at 302. Similarly in *Banner* with respect to the FY 2007 threshold, the D.C. Circuit addressed arguments that the threshold was arbitrary and capricious. *See Banner*, 867 F.3d at 1356. Although the general contention that a rule is arbitrary and capricious is still too broad for issue preclusion, the Hospitals are not currently pressing any such contention anyway about the FY 2007-2011 rules that were at issue in *Banner* and *Billings*. They allege that HHS issued the FY 2007-2011 thresholds without "observance of procedure required by law," 5 U.S.C. § 706(2)(D), namely adequate notice and comment. The legal standard applicable to that question is, obviously, different from the legal standard applicable to the arbitrary and capricious arguments in *Banner* and *Billings*. *See, e.g.*, *NVE, Inc. v. HHS*, 436 F.3d 182, 190 (3d Cir. 2006) ("The arbitrary and capricious standard focuses a court on the agency's process of reasoning. . . . With respect to NVE's [notice and comment] claim, . . . the District Court 'must determine whether the notice given was sufficient ....'"). The EJRs in these cases also reveal the distinction. Second Am. Compl. Exs. A–C, ECF No. 115; Second Am. Compl. Exs. A–E, ECF No. 116; Compl. Ex. A, *Cabell Huntington Hosp.*, No. 19-cv-722, ECF No. 1. (Other EJRs are attached

to HHS's Motion as exhibits. *See* Mot. 30-31.) The PRRB authorized litigation about whether the thresholds were "substantively and/or procedurally invalid." "Substantively" is different from "procedurally."[11]

Meanwhile, HHS offers zero authority to show that a case might preclude an "issue" as broad and nebulous as "the validity of the rule." It cites several cases for a generalized notion that issue preclusion affects the entirety of an issue, not just one argument made on that issue. Mot. 19. That just begs the question: what was the precluded issue? None of HHS's cases—and not the Restatement provision that HHS quotes—explains how to determine what is the scope of a precluded issue, much less suggests that the scope should be as broad as HHS contends.

*Yamaha Corp. of America v. United States*, 961 F.2d 245 (D.C. Cir. 1992) (*see* Mot. 19), actually shows the scope should be narrower. Yamaha had argued, in a suit against another company, that a regulation was invalid because it did not extend certain rights that Yamaha thought a statute mandated. The courts decided that Yamaha was interpreting the statute incorrectly. When Yamaha later sued the government challenging the regulation, the D.C. Circuit did *not* say that Yamaha was precluded from challenging the validity of the regulation. Instead, it analyzed carefully what the prior courts had decided and concluded that

[11] The Hospitals' claims proceeded before the PRRB in group appeals. Under HHS regulations, hospitals under common ownership or control must appeal as a group if their appeals "involve[] a question of fact or interpretation of law, regulations, or CMS Rulings that is common to the providers"; and unaffiliated hospitals have a right to proceed as a group if their appeals "involve[] a single question of fact or interpretation of law, regulations, or CMS Rulings that is common to each provider in the group." 42 C.F.R. § 405.1837(a), (b). The Court cannot infer from the fact that the current appeals are group appeals that the questions they raised constitute a single, precludable issue for purposes of collateral estoppel. The common "question" under the regulations is not necessarily a precise "issue"; the regulation does not limit the PRRB from accepting group appeals, in its discretion, with any number of questions or issues; and the EJRs demonstrate that the questions raised in these appeals involved at least two distinct "issues" under the *B&B Hardware* standard.

the prior issue was "whether or not Yamaha-America had any rights under [the statute]," regardless of the regulation. *Id.* at 255. Therefore, the company was "precluded from challenging the validity of the Regulation on the grounds that it violates [the statutory] rights." *Id.* at 256. Not the validity of the rule in general—rather, a specific ground for questioning the rule's validity.

In *Securities Industries Association of America v. Board of Governors of the Federal Reserve System*, 900 F.2d 360 (D.C. Cir. 1990) (*see* Mot. 19), the petitioner asked the court to reconsider the very same questions of statutory interpretation that the Second Circuit had already decided against it. Far from deliberating what should be the scope of an issue, the court concluded the petitioner was just engaged in "garden variety forum shopping." *Id.* at 364.

*Hall v. Clinton*, 285 F.3d 74 (D.C. Cir. 2002) (*see* Mot. 19), simply held that the plaintiff's argument on issue preclusion misread the previous, preclusive decision. The plaintiff, a former government employee, had tangled with the officials above her about whether a project was lawful; she said they then retaliated against her. In a first lawsuit, she brought a claim under 42 U.S.C. § 1985; the Fourth Circuit held that the Civil Service Reform Act ("CSRA") barred those claims because "the wrongful acts Hall alleges were taken against her arose out of her federal employment relationship." *Hall v. Clinton*, 235 F.3d 202, 205 (4th Cir. 2000). The plaintiff then sued again on common-law tort theories. The D.C. Circuit held that the Fourth Circuit's decision was preclusive. Refuting the plaintiff's argument that the precluded issue was just "whether the CSRA preempted Hall's section 1985 claim," the court concluded the issue was "whether the CSRA 'constituted the sole remedy for . . . [the] alleged conduct." 285 F.3d at 81 (citing 235 F.3d at 205). That conclusion was rooted in a careful reading of the prior case; and given what the Fourth Circuit decided, it was hardly a difficult conclusion to reach. Nothing

in *Hall v. Clinton* teaches *how* to analyze the breadth of issue preclusion—as *B&B Hardware* does—and nothing in the case suggests that "the validity of the rule" could be a precluded issue.

Finally, and bizarrely, HHS says that both *Canonsburg General Hospital* and this Court have decided that "the validity of a rule" can be a precluded issue and, in *Banner* and *Billings*, was such an issue. As in many of its citations, HHS relies on *Canonsburg* for a proposition that court never considered. The *Canonsburg* plaintiff raised *precisely* the same issues that it had presented to courts earlier. The plaintiff did not argue it was presenting different issues; it only asked for various exceptions to preclusion. *Canonsburg Gen. Hosp. v. Burwell*, 989 F. Supp. 2d 8, 17 (D.D.C. 2013) ("The plaintiff does not assert any argument regarding the first two elements of issue preclusion . . . Instead, the plaintiff raises four arguments . . . [that] issue preclusion would work a basic unfairness . . . ."). So the *Canonsburg* panel did not assess the scope of the issue previously decided. That the panel used the shorthand "the validity of section 2534.5" to refer to the precluded issue is not precedential, or even informative, for this case.[12]

The Court is presumably well aware that it did not decide, in its February 2017 opinion, that issue preclusion covers "the validity of the fiscal year 2007 determination," Mot. 19 (citing Mem. Op., ECF No. 89, at 17, 22). The Hospitals cannot guess why HHS suggests that it did.

Thus, Hospital X, which in *Billings* raised challenges to the FY 2007 threshold rule in service of its appeal of its 2007 cost report, is precluded on specific issues decided in the earlier case—not on the general, open-ended topic of whether the rule was "valid." Besides its conclusory assertion that "validity" is a precluded issue, HHS has offered no analysis of what the

[12] "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *In re Leopold*, 327 F. Supp. 3d 1, 24 n.16 (D.D.C. 2018) (quoting *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004)) (declining to rely on D.C. Circuit case that had not actually considered the proposition being attributed to it).

precluded issues might be or identified any other precluded issues. At any rate, they certainly cannot encompass issues regarding HHS's observance of required rulemaking procedure, a topic that was not presented in the prior cases.

3. Preclusion does not bar a hospital from presenting claims and issues that were decided against other participants in *Banner* or *Billings*

Most startlingly, HHS argues that *every* hospital that was a party in *Banner* or *Billings* is entirely precluded by everything that happened in that case—through both claim preclusion and issue preclusion. This makes no sense.

In fact, it is such a radical idea that HHS previously expressly waived that scope of preclusion in the *University of Colorado* case. When HHS moved for leave to amend its answer, the ambiguous pleading seemed to assert preclusion on the broad basis HHS now expressly urges. The plaintiffs objected. Pls.' Opp., ECF No. 67, at 9. Rather than defending that theory—the same one that HHS now says is black-letter law—HHS amended its pleadings to clarify it was not seeking preclusion on that basis. *See* Def.'s Reply, ECF No. 68, at 8 n.3. The Court accepted that concession and "agree[d] with the Hospitals[]" that even though a hospital was a party to a prior case challenging a given rule, the hospital would not be precluded unless it had raised its own claim against the rule. Mem. Op. ECF No. 89, at 24 n.20. Of course, that decision was only interlocutory and is subject to change, as noted above, *supra* at 14-15, and as HHS evidently agrees, *see* Mot. 17 (asserting the Court can still consider HHS's innovative argument). Still, it should give the Court pause that, in the course of a vigorously litigated motion, HHS thought this theory was not worth defending.

HHS's prior assessment was correct.

To return to the hypothetical Hospital X that appealed its 2007 cost report in *Billings*, Hospital X did not appeal its 2008 or any other cost report. HHS's argument is that Hospital X

can no longer appeal those other cost reports with respect to whether the applicable fixed-loss thresholds were incorrect, because *other* hospitals raised challenges to those thresholds in the *Billings* case. This is so, according to HHS, even if the Medicare Act prohibited Hospital X from appealing its 2008 or other cost reports in the earlier case.

HHS does not say whether it means claim or issue preclusion (or perhaps both, since HHS believes the issue is the same as the claim), but its theory is contrary to the basic principles of each. As noted above, a claim is precluded only if a prior litigation involved a final judgment on the same claim by a court with jurisdiction. *See Smalls*, 471 F.3d at 192. An issue is precluded only if "the same issue" was "contested by the parties." *Nuclear Energy Inst.*, 373 F.3d at 1303. If Hospital X did not appeal, say, its 2008 cost report, no issue about the FY 2009 threshold (applicable to the last portion of calendar-year 2008) was "contested" by Hospital X or could have been decided against it. Nor did Hospital X present a claim involving the FY 2009 threshold or in the prior litigation that could preclude it from making such a claim in this case.

HHS offers two categories of argument against this straightforward application of ordinary preclusion rules. First, it says that under the Restatement (Second) of Judgments, "[a] party to an action is generally bound by all determinations made during the time it is a party." Mot. 20 (citing Restatement (Second) of Judgments § 34(2) & cmt. (b)). That is not what the Restatement says. It says "[a] party is bound by and entitled to the benefits of the rules of res judicata with respect to determinations made while he was a party." Restatement (Second) of Judgments § 34(2). Thus, because Hospital X participated in *Billings* the Court must assess what are the preclusive consequences of the case for Hospital X. It does not follow what those consequences are; the Court must analyze and apply "the rules of res judicata" to determine that.

This understanding of the Restatement is, unlike HHS's, consistent with the text. If Section 34 meant what HHS says, it would overrun important principles articulated in other portions of the Restatement, such as the rule that plaintiff can bring a claim in a subsequent action when "formal barriers" prevented him from bringing his claim earlier. Restatement (Second) of Judgments § 26 cmt. (c). *Cf.* Restatement (Second) of Judgments ch. 1, Scope Note ("'[A] specific section of this Restatement [should] be understood as a part of the text as a whole."). That consequence is exactly what HHS is proposing here. For many of the Hospitals that were participants in *Banner* or *Billings*, they omitted various cost report appeals precisely because the strictures of the Medicare Act barred them from suit. Yet HHS now says those claims are precluded.

The Hospitals' understanding of Section 34 and its comment (b) is also, unlike HHS's, consistent with the explanation that the Restatement provided by citing example cases. *Not one of them* involves a party's being precluded with respect to claims it did not present in a case. They are simply about drawing the line between parties and non-parties.[13]

---

[13] A number of the Restatement's cases address the standard for service of additional claims on a party that has already submitted to a court's jurisdiction in a given case. *See Patrician Plastic Corp. v. Bernadel Realty Corp.*, 256 N.E.2d 180 (N.Y. 1970) (since existing defendant received amended complaint, failure to serve a supplemental summons was mere "irregularity" which the court "should ignore"); *Everitt v. Everitt*, 148 N.E.2d 891 (N.Y. 1958) (defendant was subject to judgment on all claims against it, not just the one mentioned in the initial summons); *Adam v. Saenger*, 303 U.S. 59 (1938) (permissible to serve a counterclaim on litigation counsel); *Cox v. Cox*, 457 F.2d 1190 (3d Cir. 1972) (when court considers amending its judgment, notice to party's litigation counsel is sufficient). In some other cases, a party that appeared in a case to litigate over a particular "nucleus of facts"—in which it had a direct stake—was bound by the court's acceptance or rejection of its arguments. *See Durfee v. Duke*, 375 U.S. 106 (1963) (respondent had been sued in earlier quiet title action and "fully litigated the issues" regarding rights to the land in question); *Adams v. Morton*, 581 F.2d 1314 (9th Cir. 1978); *Murphy v. Landsburg*, 490 F.2d 319 (3d Cir. 1973) (putative buyer of stock shares appeared in court to argue against approval of sale of shares to a third party on the basis of a supposedly binding prior contract, and then was precluded from suing for breach of the same contract in a separate action); *In re Morgan Guaranty Trust Co.,* 269 N.E.2d 571 (N.Y. 1971)

The Hospitals pointed that out in an *amicus* brief filed in another Medicare litigation where HHS is pushing the same radical theory. *Galen Hosp. Alaska, Inc. v. Azar*, No. 18-728, Amicus Br., ECF No. 23, at 14-18 (D.D.C. May 22, 2019). In response, HHS offered only one counter-example, *Adams v. Morton*, 581 F.2d 1314 (9th Cir. 1978). *Galen Hosp*. No. 18-728, Response, ECF No. 24, at 9 (June 19, 2019). That case did not even involve preclusion. Instead, just like the others the Restatement cites, it is about distinguishing parties and non-parties. In *Adams*, a group claiming to be members of the Gros Ventre Tribe sued the Interior Department to claim a share of money to be distributed as part of a settlement to the Tribe. The Tribe intervened in the district court to contend the plaintiffs were not actually tribal members. The Tribe participated at the court's invitation, but without filing a formal motion to intervene. After judgment, the Tribe appealed and argued it was never a party. The Ninth Circuit held that the Tribe was a party, and the disputes adjudicated against it were the same ones that it had raised. Nothing in the case suggests a party to a case should be bound by the results of *other* parties' disputes.

Indeed, after fully briefing its *Galen* motion to dismiss filed a year ago, and replying to the Hospitals' *amicus* brief in that case, and also filing a motion to dismiss here, HHS still has not cited a single case applying preclusion in the way it urges.[14] HHS's reading of the Restatement must be mistaken.

---

(parties who contested will by moving for postjudgment relief were bound by the court's decision on that motion); *Rudolph v. City Mgr. of Cambridge*, 167 N.E.2d 151 (Mass. 1960) (subcontractor who intervened to protect its subcontract award after adverse findings were made in lower court was bound by outcome of its unsuccessful challenge). This survey comprehensively covers all the cases that the Restatement cites for comment (b), the relevant portion of § 34.

[14] HHS quotes *Snyder v. Harris* as saying that "[w]here two or more plaintiffs join their claims under the joinder provisions of Rule 20, each and every joined plaintiff is bound by the judgment." Mot. 20 (quoting 394 U.S. 332, 337 (1969)). Ironically, *Snyder* made that

Second, HHS says a hospital in the position of hypothetical Hospital X actually did present a claim on all the threshold rules at issue in *Billings*. The logic goes like this: The Court has previously said that the "claim," for purposes of claim preclusion, is based on the underlying threshold rule; Hospital X was listed on a complaint that challenged the FY 2007-2011 threshold rules; therefore Hospital X made a claim on each of those rules, even though Hospital X was only appealing its 2007 cost report to which only the FY 2007 and 2008 rules were relevant.

A critical gap here is that Hospital X was not, itself, permitted to litigate those other threshold rules. As explained above, a hospital can bring that challenge only by going through the Medicare Act's review process, in which it files a cost report, appeals through the agency on the cost report, and then seeks judicial review regarding the cost report. HHS has repeatedly acknowledged this fact. *Galen*, No. 18-728, Mot. to Dismiss, ECF No. 11-1, at 17-18 (July 31, 2018*); Bayshore Cmty. Hosp. v. Azar*, No. 16-2353, Mot., ECF No. 29, at 33-35 (D.D.C. Mar. 16, 2018). Now HHS says a party can be "bound" by a court decision even though it has not yet gone through the Medicare appeals process. Mot. 22 (citing *Billings*). This is sophistry. Everybody who litigates in this circuit is "bound" by the circuit precedent *Billings* established. It hardly follows that the case constitutes *res judicata*, a different way to be "bound," on claims that the statute barred from judicial consideration.

HHS points out that the filings of the *Banner* and *Billings* plaintiffs were all joint. Mot. 21. Of course they were; each filing addressed multiple arguments affecting various claims

observation precisely to show that "bound by a judgment" is too simplistic a concept to answer a legal question. Parties joined under Rule 20 are bound by the judgment in their joint case, but that does not justify aggregating their claims towards the threshold for diversity jurisdiction, and *Snyder* reasoned that therefore class claims under Rule 23 cannot be aggregated to satisfy the threshold. 394 U.S. at 337-38. HHS uses the sentence from *Snyder* for exactly the sort of simplistic reasoning that *Snyder* was rejecting.

and plaintiffs. HHS has managed to find one filing—a petition for rehearing in *Banner*—that it says was joint but involved solely threshold rules for which certain plaintiffs did not have claims. *Id.* This formality is an extremely thin reed to support the heavy weight of barring a plaintiff's current claim to relief. Moreover, each plaintiff in *Banner* was a party to the appeal, and HHS offers no reason a party could not join in seeking rehearing of an aspect of an appellate decision that applied to other parties' claims.

The Court's previous conclusion that the challenge to a threshold rule is the underlying claim is not to the contrary. The Court's decision meant that Hospital X, having disputed the FY 2007 and 2008 thresholds as part of an appeal of its 2007 cost report, cannot dispute the FY 2008 threshold during an appeal of its 2008 cost report. HHS, by contrast, says Hospital X also cannot dispute the FY 2009 threshold because other hospitals in *Billings* raised that "claim." Yet HHS offers no explanation of how Hospital X could have made such a claim.

Thus, Hospital X is permitted to litigate claims arising from cost reports it did not present in *Banner* or *Billings*, and it is precluded only with respect to the claims and issues that Hospital X itself raised in those cases.

4. <u>HHS fails to establish the factual predicates for the narrow "assumed control" form of non-party preclusion</u>

Finally, HHS says preclusion should apply, regardless of whether a Hospital was a plaintiff in prior litigation, as long as the Hospital is currently under common ownership or control of one of two health systems involved in *Banner* or *Billings*. Mot. at 23-24. HHS seeks only issue preclusion on this basis. Mot. 24. Rightly so; "[p]reclusion of . . . nonparties falls under the rubric of collateral estoppel rather than res judicata because the latter doctrine presupposes identity between causes of action. And the cause of action which a nonparty has vicariously asserted differs by definition from that which he subsequently seeks to litigate in his

own right." *Montana v. United States*, 440 U.S. 147, 154 (1979). Even for issue preclusion, because HHS has failed to satisfy its burden to show an identical issue that the relevant hospitals are trying to relitigate, HHS's "common control" argument fails and is purely academic. *See Democratic Cent. Comm.*, 842 F.2d at 409.

Even on its own terms, HHS's "common control" argument is not a proper basis for dismissal on the pleadings. The rule is "fundamental [and] . . . general . . . that a litigant is not bound by a judgment to which she was not a party," and that rule admits only "discrete exceptions that apply in limited circumstances." *Taylor*, 553 U.S. at 898. *Taylor* listed the six recognized exceptions. The existence of a parent-subsidiary relationship among corporations was not among them. *Id*. at 894-96. HHS invokes the exception for when a nonparty "assume[d] control" over the litigation, *id*. at 895, but that exception applies only when the person to be precluded "ha[d] effective choice as to the legal theories and proofs to be advanced in behalf of the party to the [prior] action." Restatement (Second) of Judgments § 39 cmt. (c). "Whether . . . involvement in the action is extensive enough to constitute control is a question of fact." *Id.*[15] For an affirmative defense such as issue preclusion, *see Democratic Cent. Comm.*, 842 F.2d at 409, dismissal on a fact-based point such as control of the prior litigation is inappropriate. *See De Csepel v. Republic of Hung*, 714 F.3d 591, 608 (D.C. Cir. 2013) ("[A]n affirmative defense may only be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint.") (citation omitted).

[15] "The critical judgment cannot be based on isolated facts. . . . [A]n inquiring court must consider the totality of the circumstances to determine whether they justify a reasonable inference of a nonparty's potential or actual involvement as a decisionmaker in the earlier litigation . . . [whether] the evidence as a whole shows that the nonparty possessed effective control over a party's conduct of the earlier litigation as measured from a practical, as opposed to a purely theoretical, standpoint." *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 759 (1st Cir. 1994).

To avoid that principle, HHS asserts that *Gulf Power Co. v. FCC*, 669 F.3d 320, 324 (D.C. Cir. 2012), held that when two entities are under "common control," a judgment against one is preclusive against the other. Mot. 23-24. Had the D.C. Circuit actually issued that pronouncement, it would have contravened *Taylor*, which authorized no such general rule. Unsurprisingly, that is not what *Gulf Power* said. In fact, the court said "that relationship"—referring to the "common control and complete ownership" relationship between Gulf Power, its sister company, and their parent—"may not always show sufficient control." The court proceeded to analyze the specific facts relevant to Gulf Power.

HHS relies principally on allegations in the complaints that say certain hospitals are affiliated with Banner Health or Allina Health. Mot. 24-25. These allegations, which are reproduced in pertinent part in a footnote here,[16] go no farther than showing "common control and complete ownership." Under *Taylor* and *Gulf Power*, that is not enough.

HHS offers just two other facts (neither of which is apparent from the current complaints): that the affected hospitals are represented by the same counsel as litigated *Banner* and *Billings*, and that the hospitals "are litigating this case together." Mot. 24. As to the first, "[i]t is not sufficient . . . , that the person [against whom preclusion is asserted] . . . supplied counsel to the party." Restatement (Second) of Judgments § 39 cmt. (c). As to the second, HHS's vague description of "litigating together" is far from being "similar circumstances" (Mot. 23-24) to *Gulf Power*. The D.C. Circuit cited an extensive range of relevant facts. By

[16] Am. Cmpl., ECF No. 114, at ¶ 6.h-.j; Am. Cmpl., ECF No. 128, at ¶ 6(g),(aa)-(bb); and *Sarasota Mem'l Hosps. v. Azar*, No. 19-860, Cmpl., ¶ 6(m), (t), (w) (Mar. 26, 2019): Banner Casa Grande Medical Center, Banner Ironwood Medical Center, and Regina Hospital are "under the common ownership and control" of Banner Health and Allina Health, respectively.

comparison, "litigating together" falls far short of meeting HHS's burden to show the affiliated hospitals had "effective control" of each other's litigation.

HHS's off-handed invocation of two other *Taylor* exceptions—a party was "adequately represented" in the prior case and a party is an "agent for a party" from the prior case—should not merit discussion. *Cf. Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 247 F. Supp. 3d 76, 101 (D.D.C. 2017) ("[I]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."). *Gulf Power* indicated that the "assumed control" exception is the "most pertinent" when the notion is that one affiliate's litigation should be preclusive in another's. *See* 669 F.3d at 323. HHS offers no reason to think these other two exceptions would fit better here.

In short, HHS's notion that "[a]ll the hospitals are litigating this case together" (Mot. 24) is just the sort of casual, open-ended preclusion that *Taylor v. Sturgell* proscribed.

### D. HHS Failed to Comply With the Medicare Act's Notice-and-Comment Requirements Before Applying Its Pivotal Cost-to-Charge Ratio Adjustment Factor

HHS acknowledges it must use notice-and-comment procedures to set the fixed loss threshold. Mot. 32. Yet the critical methods that HHS uses to decide on a threshold are, according to HHS, exempt from the notice-and-comment requirement because the methods themselves do not "have any independent legal significance or binding effect." Mot. 32. HHS does not assert that it provided notice-and-comment for the underlying methods; its basis for seeking dismissal is that it says notice-and-comment procedures were not required. Mot. 31.

#### 1. Notice-and-comment on a proposed threshold means notice and comment on the methods and facts supporting the choice of threshold

This is well enough established it should go without question.

*Owner-Operator Independent Drivers Association v. FMCSA*, 494 F.3d 188, 201 (D.C. Cir. 2007) (vacating rule in part because of inadequate notice and comment): "Because the time-

on-task multipliers were an integral part of the operator-fatigue model, and because the output of that model was central to FMCSA's decision to adopt the 2005 Rule . . . the model and its methodology were unquestionably among the most critical factual material that [was] used to support the agency's position. . . . The failure to provide an opportunity for comment on the model's methodology therefore constitutes a violation of the APA's notice-and-comment requirements." (alternations in original).

*Air Transportation Association of America v. FAA*, 169 F.3d 1, 8 (D.C. Cir. 1997) (citation omitted) (vacating decision for inadequate notice and comment): "Where an agency's analytic task begins rather than ends with a set of forecasts, sound practice would seem to dictate disclosure of those forecasts so that interested parties can comment upon the conclusions properly to be drawn from them."

*American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236, 242 (D.C. Cir. 2008) (alteration in original) (remanding rule for inadequate notice and comment): "Public notice and comment regarding relied-upon technical analysis, then, are '[t]he safety valves in the use of . . . sophisticated methodology.'"

*Shands Jacksonville Medical Center v. Burwell*, 139 F. Supp. 3d 240 (D.D.C. 2015), is an instructive precedent. HHS changed its rule, under which a patient must stay in a hospital for 24 hours for the hospital to be presumed eligible for inpatient reimbursement rates (which are higher than outpatient rates), to require instead a stay of at least two midnights. *Id.* at 246-47. Forecasting the effects of that change, HHS said "[o]ur actuaries have estimated that our proposed policy" would increase costs by $220 million, which HHS offset through a reduction in reimbursement rates. *Id.* at 245, 247. But the proposed rule did not disclose a number of "key assumptions" and "methodological steps" that the actuaries used—assumptions that many

hospitals disputed when they were eventually revealed. *Id.* at 262-63. The court held HHS had violated its notice-and-comment obligations because "without that information, commenters had no basis to understand or to critique the Secretary's conclusion" that costs would increase. *Id.* at 263.

The method at issue here was every bit as critical, indeed more so. After all, *Banner* held that the lack of such a method made the FY 2004-2006 rules arbitrary and capricious. 867 F.3d at 1349. HHS has chosen to set thresholds as follows: It forecasts what hospitals' charges will be, and it forecasts what their cost-to-charge ratios will be. Using those two factors, it calculates expected payments (in essence, charges times cost-to-charge ratios), and it adjusts the threshold until those expected payments are at the desired level. *See Billings*, 901 F.3d at 306-07. In this analytical method, the forecasting of cost-to-charge ratios is half the work. How HHS chose to do that forecast was, indeed, "among the most critical factual material that [was] used to support the agency's position." *Owner-Operator*, 494 F.3d at 201.

The Hospitals' procedural complaint is simply that HHS did not provide a proper notice and opportunity to comment on that forecasting method.

HHS cites a congeries of cases to support its notion that it can avoid notice and comment for the main facts and analyses supporting a rule. None of them does. For example, *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 355-56 (D.C. Cir. 2017), merely found that HHS's guidance on enforcement priorities for outlier reconciliation did not itself comprise a substantive legal standard, because a proper regulation already subjected all hospitals to potential reconciliation. That does not suggest that for an actual legal standard, which HHS admits the fixed loss threshold is, the notice-and-comment obligation is lighter than usual.

In *Hermes Consolidated, LLC v. EPA*, 787 F.3d 568, 573 (D.C. Cir. 2015), EPA was obligated to consult with the Energy Department for a certain type of exemption decision. The Energy Department adjusted the rubric for how it summarized its input—though not the substance of its fact-gathering. Concluding that the change to the rubric did not need notice and comment, the court emphasized that EPA was only consulting with the Energy Department and EPA had considered the actual facts the Energy Department gathered. *Id.* at 577. Here, choosing the method for forecasting cost-to-charge ratios was the real policy decision that, in part, drove the setting of the threshold. Given HHS's methodological choices, the threshold was basically calculated by a computer.

In *Sierra Club v. EPA*, 356 F.3d 296 (D.C. Cir. 2004), EPA provided general notice-and-comment on a model for forecasting air quality. EPA adjusted the results for three particular days, and the petitioner attacked that adjustment as arbitrary and capricious and beyond EPA's statutory authority. In a footnote, the court rejected a notice-and-comment argument regarding the three-day adjustment. HHS seems to infer that EPA did not need to do notice and comment on the adjustments. Mot. 33. In fact, the court assumed (without deciding) that notice and comment *were* required, and it held the petitioner had not shown they were lacking. 356 F.3d at 306 n.8.

*Fund for Animals, Inc. v. United States BLM*, 460 F.3d 13 (D.C. Cir. 2006), is even less relevant. Affirming the dismissal of an APA suit, the D.C. Circuit held that an agency's budget request is not final agency action. *Id.* at 20. The fixed loss threshold, of course, is final action. So too was HHS's choice in the FY 2007 rule to use a particular method for cost-to-charge ratios: "[I]n this final rule," HHS said, "we are adopting as final the methodology we will use to

calculate the final outlier fixed-loss cost threshold." 71 Fed. Reg. 47,870, 48,149 (Aug. 18, 2006).

2. HHS's policy about how to forecast cost-to-charge ratios was itself a substantive legal standard

Even if the law were not so clear that an agency must seek public comment on important facts underlying its rules, the Medicare Act specifically requires notice and comment for every "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services." 42 U.S.C. § 1395hh(a)(2). HHS's decision about how to forecast cost-to-charge ratios was "at least a statement of policy," *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019), because it told hospitals how HHS would be carrying out an important step in determining the payment of outlier reimbursements.

HHS contends the method was nonetheless not a "substantive legal standard" because it "do[es] not have any independent legal significance or binding effect." Mot. 31-32. The *Allina* decisions foreclose both those points. HHS argued to the Supreme Court that "substantive" encompasses only statements that "have the force and effect of law," and the Court held that "can't be right." 139 S. Ct. at 1811. And the D.C. Circuit's decision, which the Supreme Court affirmed, shows that a policy need not have "independent" significance.

The policy at issue in *Allina* involved the calculation of "DSH" payments, made for treating a disproportionate share of low-income patients. *Allina Health Servs.*, 863 F.3d at 938. A hospital's DSH payment "is calculated . . . by adding two fractions that together approximate the proportion of low-income patients" that a hospital serves. *Id.* at 938-39. HHS calculates the first of the two fractions for each hospital. *Id.* at 939. Precipitating the litigation, HHS changed its policy about how, in calculating this fraction, to account for patients enrolled in Medicare managed care (known as "Part C"). Note, what fiscal intermediaries are actually required to use

is the resulting fraction that HHS calculates and publishes. *Id.* at 943. Yet the D.C. Circuit held that HHS's policy about including Part C patient-days in the calculations was a "substantive legal standard," because it partly determines how HHS calculates the DSH fractions that govern reimbursements. *Id.*

Aside from the fact that the threshold is the same system-wide instead of being hospital-specific—a difference that should not matter—this case is similar to *Allina*. The method that HHS used to forecast cost-to-charge ratios was part of HHS's established technique for selecting fixed-loss thresholds, just like HHS's policy of counting Part C days was part of its technique for calculating DSH fractions. What ultimately determines a hospital's outlier reimbursement is the threshold, but similarly what ultimately determines a hospital's DSH payment is the fraction that HHS calculates. The *Allina* court viewed the Part C policy as substantive even though it did not have "independent legal significance" any more than the cost-to-charge ratios method does.

3. <u>HHS ordinarily treats changes in its threshold-setting methodologies as being subject to notice and comment requirements</u>

HHS's consistent practice belies its present litigation position. Over and over, HHS has routinely given notice of and the chance to comment on changes to its various methods used to establish the threshold. These methods include HHS's (a) method to compute inflation (including what periods of data to use to calculate inflation), (b) method to account for the impact of reconciliation (proposed in the FY 2020 rulemaking), and (c) method to estimate cost-to-charge ratio decreases (although, as discussed, HHS did not provide notice of its method in the FY 2007 rulemaking, it later changed that method using notice and comment in the FY 2014 rulemaking).[17] HHS expressly subjected each of these methods to notice and comment. While

[17] *See, e.g.*, 70 Fed. Reg. 23,306, 23,469 (May 4, 2005) ("For FY 2006, we are proposing a new methodology to calculate the outlier fixed loss threshold" by using more recent hospital charge data to calculate charge inflation.); 78 Fed. Reg. 27,486, 27,766-767 (FY 2014) (May 10,

not dispositive, HHS's practice regarding those methods shows that HHS, despite its current litigation position, views notice and comment as obligatory for the methods on which it relies in setting a threshold.

**E. <u>HHS Has Identified No Prior Inconsistent Position That Could Warrant Judicial Estoppel.</u>**

HHS says some of the Hospitals should be judicially estopped from arguing that HHS adopted a rule of using a particular method to adjust cost-to-charge ratios when setting thresholds. Estoppel is within the Court's discretion, *see Paleteria La Michoacana*, 188 F. Supp, 3d at 95, and it would make little sense to estop some of the plaintiffs from making arguments that HHS concedes others can make. *See* Mot. 34 (seeking estoppel against only some of the Hospitals). At any rate, none of the factors that the Court should consider regarding judicial estoppel is in favor of HHS's demand.

*The Hospitals have not taken inconsistent positions.* Judicial estoppel is only possible if "a party's later position [is] clearly inconsistent with its earlier position," and "[d]oubts about inconsistency often should be resolved by assuming there is no disabling inconsistency." *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010). Here, the Court need not even have doubts. HHS's theory is that the *Banner* plaintiffs presented HHS's FY 2004-2006 rules as using a method for cost-to-charge ratios that was part of the threshold rules, not a separate rule. Oddly for an invocation of judicial estoppel, HHS does not cite a single instance where the *Banner* plaintiffs took this position; HHS vaguely asserts that "all the parties and the court treated" the

---

2013) ("[W]e are proposing to adopt a new methodology"; changing once again the period of the data used to calculate charge inflation); 84 Fed. Reg. 19,158, 19,592 (May 3, 2019) (proposing "Methodology to Incorporate an Estimate of Outlier Reconciliation in the FY 2020 Outlier Fixed-Loss Cost Threshold"); 78 Fed. Reg. at 27,767 (proposing to adopt the method to adjust cost-to-charge ratios that commenters had recommended for the previous six years).

rules this way. Mot. 34. But even if the plaintiffs had taken the position HHS attributes to them, there is no inconsistency. Having a method embedded in the FY 2004-2006 rules would not prevent HHS from adopting a different method by rule later.

*The* Banner *plaintiffs did not prevail on their supposed position.* To be sure, the D.C. Circuit decided against HHS on some issues regarding the FY 2004-2006 rules. But that is not enough. The alleged position of the *Banner* plaintiffs, that the method was part of the FY 2004-2006 rules, "had no impact" on the court's decisions." *See Paleteria La Michoacana*, 188 F. Supp, 3d at 96. HHS concocts a hypothetical argument that the *Banner* plaintiffs might have tried if they had clearly presented cost-to-charge ratio adjustment as being a topic distinct from threshold-setting, and HHS says that hypothetical argument would have failed. Mot. 33-34. None of this shows that the *Banner* court was persuaded by a position that the FY 2004-2006 rules contained cost-to-charge adjustment as an integral, not separate, policy. None of this shows the *Banner* court was even aware of the position HHS imagines. The fact that this supposed position did not matter in *Banner* "is determinative" that judicial estoppel is inappropriate. 188 F. Supp. 3d at 96.

*HHS is not prejudiced by the supposed change in positions.* HHS does not offer any reason that any difference between the *Banner* litigation and this case would "impose an unfair detriment." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001).

### F. <u>HHS Cannot Contest the Addition of Certain Claims by Amendment</u>

As a final thought, HHS says that certain claims are barred by the statute of limitations because they were originally added by amendment under Rule 15(a) rather than supplementation under Rule 15(d) of the Federal Rules of Civil Procedure. As HHS notes, these claims first appeared in their respective cases in amended complaints filed under Rule 15(a)(1) (which allows a single amendment by right, early in the proceedings). Mot. 39-40 (citing claims for

which HHS invokes its statute of limitations argument). The argument goes like this: facts that come into existence after the original complaint is filed can only be added by supplementation; supplementation requires leave of court; because the amended complaints were filed by right rather than by leave, the claims at issue were not filed; because the claims were not filed at the relevant times, HHS can now invoke the 60-day statute of limitations. Each step in that argument is incorrect.

*Fresh facts can be introduced by amendment.* HHS notes that *United States v. Hicks*, 283 F.3d 380, 385 (D.C. Cir. 2002) (emphasis omitted), said an amendment "typically rest[s] on matters in place prior to the filing of the original pleading." Mot. 37. However, *Hicks* did not hold that it is impermissible to add new facts or transactions in an amendment. The facts at issue in *Hicks* predated the complaint, and the court therefore concluded they were certainly permissible to add by amendment. Since *Hicks*, courts have readily accepted new facts by amendment. In *Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018) (emphasis added), the D.C. Circuit held "that a plaintiff may cure a standing defect under Article III through an *amended* pleading alleging facts that arose after filing the original complaint." The court also noted the standards for supplementation under Rule 15(d), *id.*, but it was well aware that the plaintiff had filed only a motion to amend and not a motion to supplement, *see id.* (referring repeatedly to the proposed "amended complaint"). In *Northstar Financial Advisors, Inc. v. Schwab Investments*, 779 F.3d 1036, 1043-47 (9th Cir. 2015), the plaintiff amended its complaint to add newly-arising facts bearing on jurisdiction. The courts simply treated the amendment, after filing as a supplement. Rejecting the notion that the plaintiff should have filed a new complaint instead, the Ninth Circuit said "[a] rule that would turn on the label attached to a pleading is difficult for us to accept." *Id.* at 1047.

*An amended complaint filed with the court is not "without legal effect*." In *Scahill* and *Northstar* the amended complaints were by leave of court. But the same result obtained for complaints filed by right, without leave, under Rule 15(a)(1) in *Feldman v. Law Enforcement Associates Corp.*, 752 F.3d 339, 343 (4th Cir. 2014), and *Prasco, LLC v. Medicis Pharmaceuticals Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008). *See* Exs. B, D (district court dockets for *Feldman* and *Pasco*). Notably, in *Feldman* that complaint "add[ed] SOX claims that had since [the original complaint] become ripe." 752 F.3d at 343.[18] In *Prasco*, the court said the amended complaint was "technically . . . a supplemental complaint," but "these misnomers are not of any significance." 537 F.3d at 1337 (quoting 6A Wright & Miller, Federal Practice and Procedure § 1504, at 184). "As the district court accepted Prasco's Amended Complaint, it is the Amended Complaint that is currently under consideration." *Id.*

To show the relevant complaints here were "without legal effect," HHS cites a case in which the district court clerk refused to accept an amendment for filing because the time for amendments by right had elapsed, *United States ex rel. Mathews v. HealthSouth Corp.*, 332 F.3d 293, 294 (5th Cir. 2003); one in which the district court disallowed a filing for that reason, *Schmidt v. United States*, 749 F.3d 1064, 1069 (D.C. Cir. 2014); and one in which this Court struck claims that a plaintiff had filed in direct contravention of the Court's order, *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 26 (D.D.C. 2015). *See* Mot. 37-38. These examples have little relevance for this case, where the complaints at issue were filed at a proper time for amendments by right; the court accepted the filings as submitted (*cf. Prasco*, 537 F.3d at 1337);

[18] The *Feldman* opinion notes the plaintiff "clearly sought and was allowed by the court" to add his claim. 752 F.3d at 347. However, the district court docket demonstrates that the court simply extended the deadline for an amendment by right, rather than giving leave for the amendment itself. Ex. B; *see also* Ex. C (order extending deadline). On HHS's theory, this amendment by right that included new facts should have been void.

and HHS made no objection at the time. Indeed, far from objecting, HHS actually answered one of the complaints and largely admitted the fresh allegations[19]—a response at odds with HHS's new the allegations were "without legal effect."

*HHS cannot now present a limitations defense*. A statute of limitations is an affirmative defense that must be raised in the first pleading or motion responding to a claim. Fed. R. Civ. P. 8(c); *see Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 343-44 (D.C. Cir. 1997). HHS did not include its statute of limitations defense in its answer to the amended complaint in *Charleston Area Medical Center*, so that defense is waived. In *West Virginia University Hospital*, HHS did not answer the amended complaint at all by the deadline (January 2, 2019, at the latest). In that case its statute of limitations defense is forfeited. *See Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108-09 (D.C. Cir. 2019) (default forfeits a limitations defense). HHS does not contend the 60-day deadline is jurisdictional so as to be non-forfeitable

(Mot. 38); nor could it, after the Supreme Court held a comparable deadline (180 days to appeal to the PRRB) to be non-jurisdictional. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 161 (2013).

HHS waited 41 months and 21 months, respectively, to mention its notion that claims presented in amended complaints filed long ago had actually never been filed. The Hospitals urge the Court to reject this sort of game-playing and resolve the claims on the merits.

## VI. CONCLUSION

For these reasons, the Hospitals ask the Court to deny HHS's Motion to Dismiss.

---

[19] *Charleston Area Med. Ctr. v. Burwell*, Answer to the Am. Comp., No. 15-3031, ECF No. 12, at ¶ 6(x)-6(ii) (Feb. 22, 2016).

Dated this 26th day of July, 2019.

Respectfully submitted,

*/s/ Keith Bradley*
Keith Bradley
D.C. Bar No. 252505
Sven C. Collins*
Kelly Mihocik**

*Admitted Pro Hac Vice
** Moving for Admission Pro Hac Vice
SQUIRE PATTON BOGGS (US) LLP
1801 California St., Suite 4900
Denver, CO 80202
(303) 830-1776
E-mail: keith.bradley@squirepb.com
Counsel for Plaintiffs

**REQUEST FOR ORAL HEARING**

Due to the complex litigation history relating to HHS's rulemakings, the Hospitals believe that oral hearing will assist the Court in resolving the issues raised in HHS's motion to dismiss and in the Hospital's response.