**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UNIVERSITY OF COLORADO HEALTH AT MEMORIAL HOSPITAL, *et al.*, | : : : | | |
| Plaintiffs, | : : | Civil Action No.: | 14-1220 (RC) |
| v. | : : | Re Document Nos.: | 167, 168 |
| XAVIER BECERRA, Secretary of Health and Human Services, | : : : : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL RECONSIDERATION AND DENYING PLAINTIFFS' MOTION FOR CONTEMPT**

**I.  INTRODUCTION**

Plaintiffs are a group of hospitals that challenge a series of rules issued by the Secretary of Health and Human Services, head of the Department of Health and Human Services ("HHS"). In a previous opinion, the Court ordered the Secretary to supplement the administrative record with several kinds of documents. The Secretary turned over some documents but withheld others. He now moves the Court to reconsider its prior order and allow him to avoid disclosing documents he says are privileged. Plaintiffs ask the Court to hold the Secretary in contempt. They say he was not permitted to withhold any documents as privileged. And they argue that some of the documents the Secretary did disclose were insufficient to comply with the Court's order. The Court grants in part and denies in part the Secretary's motion. After reviewing the purportedly privileged documents *in camera*, the Court agrees that most of their contents do not belong in the administrative record—but a portion of them does. The Court also denies

Plaintiffs' motion to hold the Secretary in contempt, though it does order him to produce additional documents.

## II.  BACKGROUND

### A.  Statutory Background

This long-running case centers on Medicare's outlier-payments program. The Court has detailed how the program functions elsewhere,[1] so it will provide only a brief overview here.

Medicare is a federal program that funds health insurance for the elderly and disabled. *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011). When a hospital provides health care to a patient covered by Medicare, the federal government typically reimburses it at a fixed rate for the category of treatment it provided regardless of the actual cost it incurred. *See id.* To compensate hospitals for especially complex and costly cases, however, Medicare offers supplemental "outlier payments." *See Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1009 (D.C. Cir. 1999). A hospital is entitled to an outlier payment when the cost of care for a patient exceeds a dollar amount called the "fixed loss threshold," which the Secretary sets each fiscal year. *Banner Health v. Sebelius*, 945 F. Supp. 2d 1, 8 (D.D.C. 2013).

Because the costs of care for a given patient are hard to measure, HHS estimates them by multiplying what the hospital charged by a hospital-specific "cost-to-charge ratio" or "CCR." *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 49–50 (D.C. Cir. 2015). That ratio, which is based on historic data a hospital provides to HHS, represents the hospital's "average markup" over its actual costs. *See id.* at 50 (citation omitted). Separately, the Secretary sets the

---

[1] *See Univ. of Colo. Health v. Burwell*, 151 F. Supp. 3d 1, 7–11 (D.D.C. 2015); *Univ. of Colo. Health v. Burwell*, 164 F. Supp. 3d 56, 59–60 (D.D.C. 2016); *Univ. of Colo. Health v. Burwell*, 233 F. Supp. 3d 69, 73–75 (D.D.C. 2017); *Univ. of Colo. Health v. Azar*, 486 F. Supp. 3d 185, 194–96 (D.D.C. 2020).

fixed loss threshold in an annual rulemaking. His aim in setting the threshold is to comply with a statutory mandate that restricts outlier payments to no "less than 5 percent nor more than 6 percent" of the typical fixed-rate-based payments for that year. 42 U.S.C. § 395ww(d)(5)(A)(iv); *see also Dist. Hosp. Partners*, 786 F.3d at 51. The task requires predicting hospital costs, which, in turn, depends in part on estimates of hospitals' CCRs. *See Dist. Hosp. Partners*, 786 F.3d at 51. To account for anticipated inflation when estimating CCRs, HHS began applying a "CCR adjustment factor" beginning with the FY 2007 Rule. *See* FY 2007 Final Rule, 71 Fed. Reg. 47,870, 48,150 (Aug. 18, 2006).

### B.  Procedural Background

Plaintiffs levy a variety of critiques against the fixed loss threshold rulemakings from fiscal years 2007 to 2016. But the issue here is a preliminary one. It concerns whether the administrative record that will form the basis for judicial review is complete.

In an earlier motion, Plaintiffs asked the Court to require the Secretary to supplement the rulemaking records with several kinds of materials. *See* Pls.' Mot. Suppl. Administrative R. ("Pls.' Mot. Suppl.") at 11–13, ECF No. 141. Two are relevant here. First, Plaintiffs requested that the Secretary add a document associated with a one-page table in the record called "Attachment A." *See id.* at 13–17. Attachment A summarizes different estimates for cost increases that HHS used in developing the CCR adjustment factors. *See* Pls.' Mot. Suppl., Ex. A, ECF No. 141-1; *see also* FY 2007 Final Rule, 71 Fed. Reg. at 48,150. Plaintiffs argued that the "Attachment" label commonsensically implied the existence of some main document that was not included in the record. Pls.' Mot. Suppl. at 16. The Court agreed. It thus ordered "the Secretary to disclose to Plaintiffs the full document with which 'Attachment A' is associated." *Univ. of Colo. Health v. Azar*, 486 F. Supp. 3d 185, 212 (D.D.C. 2020). When the Secretary had

disclosed the document, the Court went on, Plaintiffs could "renew their argument that [it] should be part of the administrative record." *Id.*

Second, Plaintiffs asked the Secretary to include in the record calculations behind two figures used in the FY 2014, FY 2015, and FY 2016 Rules. One figure estimated actual outlier payments for previous fiscal years, which HHS compared to its initial projections for those years. *See* Pls.' Mot. Suppl. at 20. Aside from stating that the estimates resulted from "simulations" conducted on certain data sources, the rules offered little explanation for them. *See, e.g.*, FY 2014 Final Rule, 78 Fed. Reg. 50,496, 50,983 (Aug. 19, 2013) ("This estimate of 4.77 percent is based on simulations using the FY 2012 MedPAR file (discharge data for FY 2012 claims)."). The other figure was the CCR adjustment factor. *See* Pls.' Mot. Suppl. at 23. HHS changed its methodology for calculating adjustment factors beginning with its FY 2014 Rule. *See* FY 2014 Final Rule, 78 Fed. Reg. at 50,978. Plaintiffs requested the calculations HHS performed to arrive at both figures "in whatever form they were originally prepared." *See* Pls.' Mot. Suppl. at 22; *see also id.* at 20–23. The Court granted the request and instructed the Secretary to include in the record the "actual" computations it had made for each figure. *See Univ. of Colo. Health*, 486 F. Supp. 3d at 214 (quoting Pls.' Mot. Suppl. at 22); *see also id.* at 213–15.

Shortly after issuing its decision on Plaintiffs' motion to supplement, the Court ordered the Secretary's compliance by June 15, 2020. *See* Min. Order (Apr. 14, 2020). It also told the Secretary to "file any motion requesting relief" from the decision "for materials that the agency cannot locate or otherwise produce" by June 29. *Id.* On June 15, the Secretary provided Plaintiffs with materials that included code for a data analysis software, outputs from running the code, and summary tables, all of which pertained to the estimated outlier payment and CCR adjustment factor calculations. *See* Secretary's Notice of Production of Suppls. to

Administrative Rs. at 2, ECF No. 165.  The Secretary admitted that the materials did not include any document associated with Attachment A.  *Id.*

On June 29, the Secretary asked to be excused from disclosing such a document.  *See* Secretary's Mot. for Partial Recons. ("Def.'s Mot."), ECF No. 167.  Apparently, Attachment A was appended to drafts of a briefing document for the Centers for Medicare and Medicaid Services ("CMS") Administrator leading up to the FY 2007 Rule (but not the final document ultimately used to brief him).  Decl. of Demetrios Kouzoukas, Def.'s Mot., Ex. 1 ("Kouzoukas Decl.") ¶ 7.  The Secretary asserts that these documents are protected by the deliberative process privilege.  Def.'s Mot. at 1; *see also* Secretary's Reply Mem. Supp. Mot. Partial Recons. ("Def.'s Reply") at 5–6, ECF No. 172.  That same day, Plaintiffs moved the Court to hold the Secretary in contempt for refusing to turn over any Attachment A document and for failing to disclose adequate documentation relating to the requested calculations.  *See* Pls.' Mot. Contempt ("Pls.' Mot."), ECF No. 168.  For assistance in evaluating the parties' motions, the Court ordered the Secretary to produce for *in camera* review the latest draft of the briefing document that included Attachment A and the final version of that document presented to the CMS Administrator.  *See* Min. Order (Mar. 1, 2021).

### III.  ANALYSIS

The Court addresses each party's motion in turn.  First, it explains why the Secretary should have asserted privilege earlier.  Nevertheless, having seen the Attachment A documents, the Court agrees that most of their contents do not belong in the administrative record.  It thus requires the Secretary to disclose only the portions of the final briefing document that explain the methodology HHS used to produce Attachment A.  Second, the Court will not charge the Secretary with contempt.  The code that he provided Plaintiffs satisfied his obligation with

5

respect to the CCR adjustment factor calculations.  And although the code is missing a step needed to estimate past outlier payments, the Court will hold off on finding the Secretary in contempt for now.  If he continues to withhold the materials the Court orders him to produce today, however, Plaintiffs may renew their contempt motion.

### A.  Defendants Must Still Disclose the Attachment A Documents

The Court first addresses the Secretary's motion for partial reconsideration.  Federal Rule of Civil Procedure 54(b) permits a court to revise an interlocutory order "as justice requires." *Robinson v. District of Columbia*, 296 F. Supp. 3d 189, 192 (D.D.C. 2018); *see also Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011).  The standard is a "flexible" one.  *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015).  Situations that may warrant reconsideration include those in which the court has "patently misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or where a controlling or significant change in the law has occurred."  *Robinson*, 296 F. Supp. 3d at 192 (quoting *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp. 2d 258, 268 (D.D.C. 2012)).  Generally, however, a motion for reconsideration should not "be used as an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier."  *Id.*  When "litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."  *Id.* (quoting *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)).

The Secretary's reason for urging reconsideration is that the documents associated with Attachment A are subject to the deliberative process privilege.  His argument is a new one, so he offers two justifications for not raising it earlier.  First, he says he was not obligated to disclose

the Attachment A documents—and thus assert privilege—until Plaintiffs showed that HHS had improperly excluded them from the record. *See* Def.'s Mot. at 6. Second, the Secretary claims that "the number and breadth of the plaintiffs' requests" made it infeasible to "search for all documents that might have been responsive to the plaintiffs' various requests and address them individually." *Id.*; *see also* Def.'s Reply at 3. Neither justification is persuasive.

The Secretary's first explanation makes little sense. Resolving Plaintiffs' motion to supplement required the Court to assess whether documents associated with Attachment A "should have been properly a part of the administrative record." *Univ. of Colo. Health*, 486 F. Supp. 3d at 200 (quoting *WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 5 n.4 (D.D.C. 2009)). And as the Secretary now points out, an agency typically does not need to include deliberative and predecisional documents in the administrative record. *See* Def.'s Mot. at 4 ("[D]eliberative and predecisional documents are ordinarily 'immaterial' and 'irrelevant' to judicial review of agency action." (quoting *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019)); *see also Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005) ("[A]n agency generally may exclude [from the administrative record] material that reflects internal deliberations."). So the Secretary's late-coming assertion that the Attachment A documents are predecisional and deliberative would have gone straight to the heart of the motion-to-supplement dispute. It is exactly the sort of "theor[y] or argument[]" typically inappropriate for a motion to reconsider because it "could have been advanced earlier" *See Robinson*, 296 F. Supp. 3d at 192.

The Secretary's second justification deserves more discussion but is unavailing as well. He explains that, when the parties were litigating the motion to supplement, he "did not know for certain that the document [associated with Attachment A] existed, or whether the document was subject to a privilege." Def.'s Reply at 3. He began looking for the document only after the

7

Court ordered its disclosure, he says, because Plaintiffs requested too many records for him to track down all responsive documents before then. *See id.* Among situations courts have found to warrant revisiting an earlier decision, the Secretary's explanation sounds like those in which the moving party has discovered new evidence the court did not initially consider. *See Stewart v. Panetta*, 826 F. Supp. 2d 176, 177 (D.D.C. 2011) ("[I]n general, a court will grant a motion for reconsideration of an interlocutory order . . . when the movant demonstrates . . . the discovery of new evidence not previously available . . . ." (citation omitted)). But the Secretary does not present his defense in those terms—and for good reason. "[E]vidence 'in the possession of the party before the judgment was rendered . . . is not newly discovered evidence that affords relief.'" *Lans v. Gateway 2000, Inc.*, 110 F. Supp. 2d 1, 5 (D.D.C. 2000), *aff'd*, 252 F.3d 1320 (Fed. Cir. 2001) (omission in original) (quoting *Am. Cetacean Soc'y v. Smart*, 673 F. Supp. 1102, 1106 (D.D.C. 1987)); *see also Ali v. Carnegie Inst. of Wash.*, 309 F.R.D. 77, 83 (D.D.C. 2015), *aff'd*, 684 F. App'x 985 (Fed. Cir. 2017).

Instead, the Secretary's infeasibility argument boils down to an appeal to the Court's discretion. He cites for support *Banner Health v. Sebelius*, No. 10-cv-1638, 2013 WL 11241368 (D.D.C. July 30, 2013). In that case, the plaintiffs asked HHS to supplement an administrative record with "thirty-six categories of materials, several of which were ill-defined." *Id.* at *9. The court originally found that "material discrepancies" between underlying data and a database justified supplementing the record with the underlying data. *Id.* In moving for reconsideration, the Secretary submitted a declaration to explain the discrepancies. *Id.* The Court cautioned that it would ordinarily "decline to consider information" that "could and should have been proffered by the movant in the first instance." *Id.* Nevertheless, it agreed to consider the new information because "the sweeping nature" of the plaintiffs' motion "complicated" the Secretary's task in

responding to it and the Court's task in reviewing it. *Id.* According to the Secretary, this case is no different.

The Court cannot agree. Plaintiffs' motion to supplement was not nearly as "sweeping" as the motion at issue in *Banner Health*. That motion demanded "thirty-six categories of materials" while, by the Secretary's count, Plaintiffs' motion requested "about seven." *See* Def.'s Reply at 3. And although some of Plaintiffs' records requests were fairly broad, their request for the documents associated with Attachment A was quite specific. *See* Pls.' Mot. Suppl. at 15–16 (asking for the "main document" Attachment A was attached to). Indeed, it was specific enough for the Secretary to find the documents within two months of the Court's disclosure order despite challenges posed by the ongoing COVID-19 pandemic. *See* Def.'s Reply at 3; Joint Status Report at 1–2, ECF No. 156. He likely could have located the documents in short order back in 2019 had he bothered to look.

If anything, *Banner Health* provides additional evidence that the Secretary should have invoked the deliberative process privilege earlier. In addition to requesting certain data, the plaintiffs there argued that an interim final rule should be part of the record. *See* 2013 WL 11241368, at *2–3. The Secretary asserted the deliberative process privilege in response to the plaintiffs' initial motion (and on a motion to reconsider, to no avail). *See id.* at *3–6. Faced with a similarly specific request here, the Secretary could have likewise examined the requested documents and claimed privilege the first time around.

But notwithstanding the Secretary's tardy assertion of privilege, the Court will permit him to withhold most of the Attachment A documents. Recall that disclosure is all that the Court required in its earlier order. *See Univ. of Colo. Health*, 486 F. Supp. 3d at 212 ("For these reasons, the Court will direct the Secretary to disclose to Plaintiffs the full document with which

'Attachment A' is associated."). It did not decide whether the document should be part of the administrative record. On the contrary, the Court informed Plaintiffs that they could "renew" their argument on that front once the document was disclosed, assuming it was "appropriate" to do so. *Id.*

Now that the Court has reviewed the Attachment A documents, it is convinced that including most of their contents in the administrative record would be inappropriate. Unless the plaintiff has made "a showing of bad faith or improper behavior," an agency's "predecisional and deliberative documents are not part of the administrative record." *See Oceana*, 920 F.3d at 865; *see also Fund for Animals*, 391 F. Supp. 2d at 197 ("[A]n agency generally may exclude material that reflects internal deliberations."). The Attachment A documents clearly fit the bill: they consist of staff recommendations to a senior HHS official. *See Am. Petroleum Tankers Parent, LLC v. United States*, 952 F. Supp. 2d 252, 265–66 (D.D.C. 2013) ("Documents including 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency,' are considered deliberative." (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980))). And Plaintiffs do not allege any bad faith or improper behavior.

That said, the documents do contain some factual information about the methodology used to produce Attachment A. By relying on Attachment A in coming up with the CCR adjustment factors, the Secretary effectively relied on the document's underlying methodology. *See Stand Up for California! v. U.S. Dep't of Interior*, 315 F. Supp. 3d 289, 293 (D.D.C. 2018) (explaining that the administrative record "includes all information that the agency considered either directly or indirectly"). And disclosing the methodology information on its own would not

reveal any "recommendations" or shed light on the "give-and-take of the consultative process." *See Am. Petroleum Tankers*, 952 F. Supp. 2d at 265–66 (citations omitted).

Accordingly, the Court grants in part and denies in part the Secretary's motion for partial reconsideration. The Secretary shall disclose the portions of the final briefing document that explain HHS's methodology for producing Attachment A so that they may be included in the administrative record. *Cf. Genus Lifesciences, Inc. v. Azar*, No. 20-cv-00211, 2021 WL 270409, at *2 (D.D.C. Jan. 27, 2021) (ordering the inclusion of FDA employees' communications in an administrative record because they contained timeline information critical to resolving the plaintiff's claims and the FDA "already had a chance to redact [deliberative] portions"). He can redact the remainder of the document. It consists of staff recommendations that should not be part of the record.

### B. The Court Will Not Hold the Secretary in Contempt for Now

The Court now turns to Plaintiffs' motion for contempt. Courts enjoy an inherent civil contempt power to enforce their orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). The power is remedial: it is meant to coerce compliance with an order or compensate for damages inflicted by noncompliance, not to punish. *See Food Lion, Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1016 (D.C. Cir. 1997); *see also Evans v. Williams*, 206 F.3d 1292, 1294–95 (D.C. Cir. 2000). To deserve to be found in contempt, the alleged contemnor must have "violated an order that is clear and unambiguous, and the violation must be proved by clear and convincing evidence." *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006) (quoting *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993)). Ultimately, however, whether to brand a party's noncompliance as contempt lies within a court's discretion. *See Marshall v. Local Union No. 639, Int'l Bhd. of Teamsters*,

593 F.2d 1297, 1303 (D.C. Cir. 1979) ("[C]ourts need not impose the contempt sanction for every violation.").

Plaintiffs argue that the Secretary has defied the Court's order on their motion to supplement and its follow-up scheduling order. They assert two bases for their motion. First, Plaintiffs say that the Secretary violated the orders when he failed to disclose any document associated with Attachment A by June 15, 2020. *See* Pls.' Mot. at 9–17. Second, they claim that the Secretary did not produce enough information on the calculations behind the estimated outlier payments and CCR adjustment factors. *See id.* at 17–20. The Court declines to hold the Secretary in contempt on either basis. Nevertheless, it will require him to disclose the portions of the Attachment A documents already discussed and turn over additional documentation regarding HHS's calculations for estimated outlier payments.

The Court dispenses quickly with Plaintiffs' first asserted basis for a contempt finding. After ordering the disclosure of the document with which Attachment A is associated, the Court entered a scheduling order that provided in part:

> [O]n or before June 15, 2020, the Secretary shall produce materials and supplement the administrative records in compliance with [the Court's order on Plaintiffs' motion to supplement]; on or before June 29, 2020, the Secretary shall file any motion requesting relief from [that order] for materials that the agency cannot locate or otherwise produce . . . .

Scheduling Min. Order (Apr. 14, 2020). Plaintiffs read the order's second clause—particularly the word "cannot"—as allowing the Secretary to ask for relief from the disclosure order only if HHS was "actually unable to comply" with it. *See* Pls.' Mot. at 9–10. A claim of privilege does not bear on the agency's capacity to locate or produce documents associated with Attachment A, they argue, so the Secretary should have turned something over by June 15. *See id.* at 9–15.

But the Court's scheduling order was not so clear cut. While Plaintiffs' reading is a plausible one, the Secretary justifiably understood the order's broad "otherwise produce" language as permitting him to claim privilege to avoid disclosure as long as he did so by June 29. The order's text does not clearly and unambiguously foreclose that interpretation. A contempt finding is thus inappropriate. In any case, the Court trusts that the Secretary will promptly turn over those portions of the Attachment A documents that he is required to under the narrowed order it issues today.

The second basis for Plaintiffs' contempt motion requires an examination into the documents the Secretary did disclose. Remember that the Court ordered him to produce the calculations that HHS used in the FY 2014, FY 2015, and FY 2016 rulemakings to estimate prior years' actual outlier payments and to compute the CCR adjustment factors. *See Univ. of Colo. Health*, 486 F. Supp. 3d at 213–15. It emphasized that the Secretary had to produce only the calculations "in whatever form they were originally prepared," *id.* at 214 (quoting Pls.' Mot. Suppl. at 22), not "all the data or materials necessary to 'fully replicate'" the agency's work, *id.* at 215. To satisfy the Court's order, the Secretary provided Plaintiffs with the code that HHS plugged into its data analysis software to reach the outputs it reported in the annual rules. *See* Pls.' Mot., Exs. 6–9, ECF Nos. 168-6 to -9.

Plaintiffs claim that the Secretary's productions were incomplete for each set of calculations. Their qualm with the CCR adjustment factor calculations is a general one. They argue that the "computer instructions" the Secretary gave them "do not present the calculations" they requested. Pls.' Mot. at 18. But as the Secretary explains, HHS's data analysis software performed the calculations, so turning over the instructions the agency gave the software is essentially the same thing as producing the calculations. *See* Secretary's Opp'n Pls.' Mot.

13

Contempt ("Def.'s Opp'n") at 8, ECF No. 170.  The code shows exactly what HHS did to turn underlying data into the key components of the formula it used to come up with the CCR adjustment factors, which itself involved a straightforward calculation the agency explained when promulgating each rule.[2]  Someone familiar with the data analysis software HHS used could interpret the code to determine how the agency came to its results.  *See* Pls.' Mot. at 18 (acknowledging that "the computer instructions appear to lay out the process" by which HHS arrived at its figures).  That is enough to "delineate[] the path by which [the agency] reached its decision."  *See Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 338 (D.C. Cir. 1989).  And

---

[2] To elaborate, HHS used the code to calculate case-weighted national average CCRs. *See* Def.'s Opp'n at 10.  For a given year's rule, HHS would compute that figure for each of the previous two years.  *E.g.*, FY 2014 Final Rule, 78 Fed. Reg. at 50,979.  The agency then computed the percentage change between the two figures.  *Id.*  The CCR adjustment factor for the year's rule equaled one plus that percentage change so that, when multiplied by another number, the product would reflect the percentage change.  For example, the percentage change between the 2013 and 2014 case-weighted national average operating CCRs was -1.79%.  Pls.' Mot., Ex. 8, at AR 019951.088.  HHS calculated the accompanying CCR adjustment factor at 0.982088 (roughly 1 + -.0179, though HHS clearly used a more specific percentage change).  *Id.*  Multiplying the factor by another number is the same thing as reducing that number by 1.79%.

A proper understanding of these steps requires rejecting one of Plaintiffs' arguments related to the adjustment factors.  Plaintiffs take issue with the Secretary's disclosure of tables that, for each rule, list the previous two years' case-weighted national average CCRs, the percentage change between those figures, and the resulting adjustment factor.  *See* Pls.' Mot. at 17–18; Pls.' Reply Supp. Pls.' Mot. ("Pls.' Reply") at 11–12, ECF No. 171; *see also, e.g.*, Pls.' Mot., Ex. 8, at AR 019951.088 (depicting the contested table for the FY 2015 Rule).  They assert that the tables "come from Microsoft Excel files" that "contain the actual calculations the Court ordered HHS to produce," so they demand the Excel files.  Pls.' Reply at 11.  Presumably, Plaintiffs seek the formulas within the spreadsheets that calculate the percentage change and adjustment factor from the case-weighted national average CCRs (which come from the code the Secretary provided, Def.'s Opp'n at 9–10; *see also* Pls.' Mot. at 18).  But as mentioned, HHS explained the straightforward percentage change and adjustment factor "calculations" in each final rule.  *See, e.g.*, FY 2014 Final Rule, 78 Fed. Reg. at 50,979 ("We then calculated the percentage change between the two national operating case-weighted CCRs by subtracting the December 2011 operating national average case-weighted CCR from the December 2012 operating national average case-weighted CCR and then dividing by the December 2011 national operating average case-weighted CCR.").  There is no need to hold the Secretary in contempt for failing to produce spreadsheets when HHS already spelled out the documents' simple formulas when it promulgated each rule.

that is all the Court required in its earlier order.  It expressly eschewed any notion that the Secretary would have to produce "all the data or materials necessary to 'fully replicate'" HHS's calculations.  *See Univ. of Colo. Health*, 486 F. Supp. 3d at 215.  The Secretary thus satisfied his obligation to produce the CCR adjustment factor calculations by turning over the code.

Plaintiffs' complaint with respect to the past outlier payment calculations is more specific—and more persuasive.  They point out that the code the Secretary provided is missing a step.  *See* Pls.' Mot. at 18–20.  The code explains that it first prepares data to "pass to the COBOL program . . . during Step 2."  *E.g.*, Pls.' Mot., Ex. 7, at AR 017665.013.  The COBOL program "estimate[s] outlier payments for individual hospitals."  Def.'s Opp'n at 9.  Then the code incorporates the COBOL program outputs for its "Step 3" calculations.  *E.g.*, Pls.' Mot., Ex. 7, at AR 017665.029 ("This Step 3 pgm reads in . . . the outlier payment amounts from the COBOL pricing program . . . .").  Nowhere do the Secretary's productions detail what operations the COBOL program performs.[3]

That is a problem.  Because the Secretary failed to produce any documentation showing how the COBOL program transforms Step 1 outputs into Step 3 inputs, the middle step in HHS's past outlier payment calculation process is a black box.  And the Secretary's excuse for the gap is not convincing.  Citing the language in the Court's order that made clear he did not have to turn over "all the data or materials necessary to 'fully replicate'" HHS's calculations, *id.*, he argues without much explanation that he did not have to produce the "subsidiary calculations" that the "separate COBOL programs" performed.  Def.'s Opp'n at 9 (footnote omitted).  But withholding underlying data and obscuring an entire step of the calculation process are two different things.  By omitting all the calculations the COBOL program performed, the Secretary's productions fall

---

[3] COBOL is a computer programming language.  Def.'s Opp'n at 9 n.6.

short of complying with the Court's order that he provide the "actual calculations" that HHS used to determine "outlier payments in past years." *See Univ. of Colo. Health*, 486 F. Supp. 3d at 214 (quoting Pls.' Mot. Suppl. at 22).

The Court exercises its discretion to decline to hold the Secretary in contempt for now. *See Marshall*, 593 F.2d at 1303. But he must turn over documentation (likely code) that lays out what the COBOL program does to "estimate outlier payments for individual hospitals" within thirty days. *See* Def.'s Opp'n at 9. If the Secretary continues to avoid disclosure, Plaintiffs may renew their motion to hold him in contempt.

\*   \*   \*

To summarize, the Secretary must disclose the portions of the final briefing document that describe HHS's methodology for producing Attachment A as well as documentation showing what operations the COBOL program performs. The parties should file a status report within thirty days of the issuance of this opinion and accompanying order setting forth the Secretary's compliance with today's order and proposing a schedule to govern further proceedings.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for partial reconsideration (ECF No. 167) is **GRANTED IN PART** and **DENIED IN PART**; and Plaintiffs' motion for contempt (ECF No. 168) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 26, 2021　　　　　　　　　　　　　　　　　　　　RUDOLPH CONTRERAS
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge